Senator A. R. SCHWARTZ, anf Richard Austin Schwartz, Plaintiff,

v.

The **GALVESTON INDEPENDENT SCHOOL DISTRICT**; the Board of Trustees of the Galveston Independent School District; Dr. Henry Jameson, Chairman; Superintendent of Galveston Independent School District, Eli Douglas; Principal of Ball High School, Richard F. Streiff; and Assistant Principal of Ball High School, Reginald Pope, Defendants.

Civ. A. No. 69-G-185.

United States District Court,
S. D. Texas,
Galveston Division.

Feb. 2, 1970.

As Corrected Feb. 16, 1970.

As Supplemented Feb. 18 and March 10, 1970.

C.A.

David H. Berg, Houston, Tex., for plaintiff.

Levy, Levy, Schwab & Coughlin, Ed Schwab, III, Galveston, Tex., for defendants.

## MEMORANDUM OPINION:

NOEL, District Judge.

This is a suit for injunctive relief by a student against school officials.

Plaintiff complains of his threatened suspension for the violation of a regulation restricting the way he may wear his hair. The issue is not whether the plaintiff has the right to wear long hair in the usual context, for the regulation permits hair to be worn much longer than what might be termed conventional or usual in Galveston, Texas. The issue is whether the School Board has the right to regulate to any extent the length of a student's hair and therefore plaintiff's hair.

Plaintiff says the real issue is what is best for students, which he interprets to be what is best for him in this instance. He feels that it is best for him to be permitted to wear his hair at whatever length he cares to, and that there is no constitutional foundation for any limitation on that right. Plaintiff casts his complaint in constitutional terms, asserting that by attempting to regulate his hair style, the school officials violate his rights of privacy, due process, equal protection, and freedom of expression.

Defendants in response deny that their regulation violates any right protected by the Constitution of the United States. They also move to dismiss for failure to exhaust available state remedies, and allege that even if plaintiff's desire to wear his hair contrary to the regulation is protected by the Constitution, their regulation is a reasonable and permissible restriction.

At the hearing set to receive evidence on plaintiff's request for a permanent injunction, this suit thus framed in constitutional terms emerged as a controversy over school policy and choice of curriculum. The significance of this change is profound.

1. *Background*

The Superintendent of Schools of Galveston has promulgated a regulation entitled "Dress." It was revised September 3, 1969, but has been in effect as a written regulation at least since March 30, 1967. For many years there has been either a written or an understood oral regulation on dress which includes hair and clothing. The current regulation applies to the matter here in controversy, and provides that "Boys must keep their hair clean, combed out of the eyes, and neatly cut."[1]

The September revision of the dress regulation was drafted in the summer of 1969. Before asking the Superintendent to amend the regulation, the Principal of Ball High School gathered together a number of representative students, students which he considered representative in the sense that they had been honored by their peers; they had been elected to various student offices and were believed to represent fairly the thinking of the student body. These students then were asked to designate a few faculty members in whom they placed their trust to assist them in reviewing the regulation. Other student leaders were also asked to participate.

The committee thus was finally composed of student leaders and faculty members selected by students, as well as the principal and associate principal. It met, discussed what standards were consistent with sound school policy, and gave the principal the benefit of its thinking in the matter. The draft prepared by the committee was carried up through administrative channels, was approved by the superintendent, and emerged as the current regulation.

The record shows that the regulation was left somewhat vague deliberately to permit students some freedom of expression and administrators some flexibility in enforcement. The record reflects it has been uniformly applied. And the record reflects that it has been liberally

---

1. Another portion of this regulation permits moustaches to be worn in the high school. To that extent it is different and, if liberal is the appropriate term, it is more liberal then many to be found in an examination of similar regulations as documented in the jurisprudence. See, e. g., Wood v. Alamo Heights Ind. School Dist., 308 F.Supp. 551, W.D.Tex., Jan. 27, 1970 (Spears, J.). It says that "Moustaches and sideburns must be kept clean and neatly trimmed."

applied. For example, Afro-haircuts as such are not prohibited at Ball High School. Neither is the wearing of hair longer than what is commonly referred to as conservative prohibited at Ball High School. In the vernacular, the requirement at Ball High School (as applied to haircuts other than Afros) has been that boys' hair be over or above the collar, behind the ears, and out of the eyes.[2]

Plaintiff was first told by the Associate Principal, and then by the Principal, and then by the Assistant Superintendent, and then by the Superintendent, that the length of his hair exceeded the length allowed by the regulation. But plaintiff declined to have his hair cut. He appealed the Superintendent's ruling to the School Board, which found the regulation valid and declined to set aside the Superintendent's decision that plaintiff was in violation. Plaintiff then filed the instant suit.

Plaintiff testified here that he wears his hair at the length he wears it solely as a matter of personal preference, but with the approval of his parents.

By plaintiff's direct testimony and upon the record as a whole, I find that he does not intend that the length or style of his hair should express any idea, opinion, or point of view. At most, it is a mere expression of his · personality which might be likened to the meaning conveyed by an artist who has painted a picture. It is plaintiff's view that he and his parents should be the sole judges of what length his hair should be.

## 2. *Jurisdiction*

### a. *Generally*

Plaintiff is an eleventh grade student at the high school operated by the defendants as part of the Galveston Independent School District. Named defendants are the Galveston Independent School District, its Board of Trustees, Chairman, and Superintendent, and the Principal and Associate Principal of Ball High School. Also named in the complaint, but not in the caption, is Ball High School. The complaint does not indicate whether the respective individual defendants are sued in their individual or official capacity, or both.

■ The Court has jurisdiction over the parties and of the subject matter. 28 U.S.C. § 1343(3); 42 U.S.C. § 1983; *Harkless v. Sweeny Ind. School Dist.*, 300 F.Supp. 794, 800 (S.D.Tex.1969). However, the complaint fails to state a claim upon which relief can be granted against any but the respective individual defendants in their individual capacity. *Harkless, supra.* This question has not been raised by counsel, but it is akin to jurisdiction, and it is the duty of the court to examine its jurisdiction.

■ In this case, as in most others brought under § 1983, dismissal of the District, Ball High School, and the respective individual defendants in their official capacity does not affect the pendency of or the issues in this lawsuit. This case is not like *Harkless*. There, because the plaintiffs had dismissed the respective individual defendants in their individual capacity during *voir dire* examination of the jury panel, dismissal of the remaining defendants required dismissal of the entire case. In most other cases, as in *Harkless* initially, suit is brought against the individual defendants in both capacities. Dismissal of the improper parties does not preclude prosecution of the suit against the proper ones. *See, e. g.,* Graham v. Houston Ind. School Dist., Civ. No. 69–H–1019, S.D.Tex., Jan. 21, 1970 (Ingraham, J.).

2. At the hearing held to receive evidence concerning plaintiff's request for a preliminary injunction, photographs of plaintiff and one Henry Greenberg, another student at Ball High School, were admitted into evidence. Although Mr. Greenberg's hair touched his collar, the Associate Principal testified that it conformed to the standard set by the regulation. Plaintiff's hair, however, did not conform. As the photographs introduced in evidence manifest, it almost reached his shoulders.

 In a suit like this for injunctive relief only, dismissal of the improper parties has no other effect at all. The relief sought is injunctive. In a suit against individual school officials in their individual capacity only, an injunction may issue binding all defendants and those acting in concert with them. Rule 65(d), F.R.Civ.P. *See generally* 7 J. Moore, Federal Practice ¶ 65.13 (1954). Such an injunction provides relief as effective as an injunction operating against a school district directly. *See* Ex parte Young, 209 U.S. 123, 173–174, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (Harlan, J., dissenting).

Only in a suit, like *Harkless,* for damages, is dismissal of the improper parties likely to have any practical effect. There, as the record of the *voir dire* examination of the jury panel after trial was commenced clearly reflects, counsel for plaintiffs made a tactical decision to dismiss the school board members in their individual capacity. The reason for this decision was that from questions asked the Court by a few members of the jury panel, it appeared that the jury would be more likely to award damages against the school district, a governmental unit, than against the school board members individually, all of whom were serving as a public service without pay.

A similar belief may have motivated Senator Sherman's attempt to amend § 2 of the Act of April 20, 1871, discussed at length in Monroe v. Pape, 365 U.S. 167, 187–192, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and *Harkless, supra,* 300 F. Supp. at 803–808. In support of his amendment, the Senator declaimed:

Let the people of property in the southern States understand that if they will not make the hue and cry and take the necessary steps to put down lawless violence in those States their property will be holden responsible, and the effect will be most wholesome. * * * It [the amended

provision] connects the property of the county with the necessity of preserving the people against lawless and tumultuous violence.[3]

But Senator Sherman's amendment was rebuffed. *Monroe, supra,* at 188–190, 81 S.Ct. 473; *Harkless, supra,* at 803–804. The Congress determined that only delinquent officials and others acting in concert with them should be liable in damages. Courts should respect such determination. But it has no practical effect here, since no damages are requested and the school officials in their individual capacity *are defendants.* I thus turn to defendants' principal procedural defense, failure to exhaust state administrative and judicial remedies.

### b. *Exhaustion*

As noted, defendants have raised another issue akin to jurisdiction in their motion to dismiss. Plaintiff has not pursued available state administrative and judicial remedies to correct the Galveston Board's allegedly erroneous decision. Two questions must be resolved: Whether exhaustion of such remedies may ever be required, and whether the state remedies relevant here are adequate and available.

### (1) *The Scope of § 1983*

I have recently held that a teacher who has not been rehired must pursue the administrative remedies provided by the State of Texas for such controversies before filing suit in federal court under 42 U.S.C. § 1983. Bonner v. Texas City Ind. School Dist., 305 F.Supp. 600 (S.D.Tex.1969). Threatened suspensions of students are arguably distinguishable from the failure to rehire teachers, *see* Sullivan v. Houston Ind. School Dist., 307 F.Supp. 1328 (S.D.Tex. 1969) (a student newspaper case written on by Judge Seals of this Court), and administrative and judicial remedies present different problems, *see, e. g.,* Note, Limiting the Section 1983 Action in the Wake of Monroe v. Pape, 82 Harv.L.Rev. 1486, 1499 (1969); Com-

---

3. Cong. Globe, 42d Cong., 1st Sess. 761 (Apr. 18, 1871), reprinted in The Reconstruction Amendments' Debates 566 (Va. Comm'n on Const.Govt.1967).

ment, Exhaustion of State Remedies in Suits Under the Civil Rights Act, 68 Colum.L.Rev. 1201 (1968). The need to require exhaustion in this case must therefore be considered afresh, in the light of the legislative history of § 1983 (the statute under which plaintiff seeks recovery) and recent decisions by the Supreme Court examining that history and the purpose of the statute.

■ As giving jurisdiction here, plaintiff cites 28 U.S.C. § 1343(3), and the declaratory judgment statute, 28 U. S.C. § 2201. The latter grants no independent jurisdiction. El Paso Bldg. & Construc. Trades Council v. El Paso Chap. Associated Gen. Contractors, 376 F.2d 797 (5th Cir. 1967). Moreover, 28 U.S.C. § 1343(3) is no broader than its companion, 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Harkless v. Sweeny Indep. School Dist., supra, at 807–808. Whether exhaustion may be required, therefore, turns on an interpretation of § 1983.

■ The brief, general language of § 1983 specifies no restrictions on the liability it imposes. Neither the availability of state remedies nor the existence of defenses to a claimant's suit is mentioned. But the "plain words" (*see* Richards v. Thurston, 304 F.Supp. 449, 455 (D.Mass.1969)) of § 1983 have not been interpreted literally. *See, e. g.*, Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). Nor should they be, for more than most statutes, § 1983 grew out of a serious evil perceived by the Congress to demand correction. The imposition of liability must be measured in terms of the intention of the Congress, and applied so as to further the purpose of its framers.

On several occasions recently the Supreme Court has touched on the need to exhaust state remedies. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L. Ed.2d 492 (1961); McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968) (per curiam); Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967) (per curiam); King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). Save for *Monroe*, however, none of these decisions is particularly helpful, for in *McNeese* [3a] and *Houghton* the Court ei-

---

**3a.** Although the Court in *McNeese* expressly found the state remedy there inadequate, 373 U.S. at 674–676, 83 S.Ct. 1433, it purported to do so only as an alternate ground for its decision. Language earlier in the opinion suggests that the Court may have considered the existence of a state remedy irrelevant. *See id.* at 671–674, 83 S.Ct. 1433. In support of this proposition, the Court quoted extensively from and relied on Monroe v. Pape, *supra*, and also cited several earlier cases.

*Monroe* is discussed at length in the text of this Memorandum Opinion, *infra*. Of the other cases cited, the most important is Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939). As in *McNeese*, language in *Lane* might

be read to suggest that exhaustion may never be required under § 1983. *See id.* at 274–275, 59 S.Ct. 872. However, the cases cited by the Court in *Lane* were abstention cases, not exhaustion cases, and the Court's opinion does not suggest that it had been urged to apply anything other than the general theory of abstention applicable to all jurisdictional statutes. Moreover, it seems quite unlikely that the Oklahoma remedy available in *Lane* was equivalent to the federal remedy afforded by § 1983. *See McNeese, supra*, 373 U.S. at 675, 83 S.Ct. 1433; *cf. Monroe, supra*, 365 U.S. at 249–255, 81 S.Ct. 473 (Frankfurter, J., dissenting). Since the history and purpose of § 1983 were not raised in *Lane*, and the question was not necessary to the decision, *Lane* should

ther expressly or by clear implication found the asserted state remedy to be inadequate, and *Damico* and *King* concerned welfare programs which are essentially federal. *See* Note, *supra,* 82 Harv.L.Rev. at 1501; Comment, *supra,* 68 Colum.L.Rev. at 1207 n. 43.

The Ku Klux Act, the predecessor of § 1983 and several other civil rights provisions, was carefully considered by Mr. Justice Douglas in his opinion for the Court in *Monroe.* Examining the legislative history, the Court found several purposes for the imposition of liability. "*First,* it might, of course, override certain kinds of state laws." 365 U.S. at 173, 81 S.Ct. at 477. (emphasis in original). The Court did not specify which kinds; it merely quoted an ambiguous statement by one of the bill's opponents. I will return to this purpose shortly.

"*Second,* [the Court said,] it provided a remedy where state law was inadequate." *Id.* (Emphasis in original.) "But [the Court continued after a brief quotation] the purposes were much broader. The *third* aim was to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice." *Id.* at 174, 81 S. Ct. at 477 (emphasis in original). This third purpose was most important to the Court. It was discussed for almost ten pages in the official reports. *Id.* at 174–183, 81 S.Ct. at 477. At the end of this careful examination of legislative history appears a paragraph often interpreted as construing § 1983 to be fully

supplementary to any remedies provided by the States:

> Although the legislation was enacted because of the conditions that existed in the South at that time, it is cast in general language and is as applicable to Illinois as it is to the States whose names were mentioned over and again in the debates. It is no answer that the State has a law which *if enforced* would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought *and refused* before the federal one is invoked. Hence the fact that Illinois *by its constitution and laws* outlaws unreasonable searches and seizures is no barrier to the present suit in the federal court.

*Id.* at 183, 81 S.Ct. at 482 (emphasis added). Read out of context, the language "The federal remedy is supplementary to the state remedy" seems to suggest that the availability of state remedies is immaterial. But it may not be read out of context. In context, the last sentence quoted is a mere reiteration of the third purpose as applied to the facts in *Monroe*:

> The *third* aim was to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice. *Id.* at 174, 81 S.Ct. at 477.

> Hence the fact that Illinois by its constitution and laws outlaws unreasonable searches and seizures is [without more] no barrier to the present suit

not be held to foreclose inquiry into the need to require exhaustion.

Similarly, the opinion in *McNeese* and the cases cited 373 U.S. at 673–674, 83 S. Ct. 1433 indicate that the Court construed the exhaustion defense there as an allegation that abstention was appropriate. All but three of the cited cases involved solely abstention. Of the three exceptions, only Borders v. Rippy, 247 F.2d 268 (5th Cir. 1957), might be considered as precedential on the exhaustion issue, for in the opinions in the other two (Browder v. Gayle, 142 F.Supp. 707 [M.D.Ala], aff'd per curiam, Gayle v. Browder, 352

U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114 [1956], and Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 [1944]), neither abstention nor exhaustion is mentioned. Nor was the issue in the instant case present in *Borders*, for the court in support of its refusal to require exhaustion relied on an earlier case, Bruce v. Stilwell, 206 F.2d 554 (5th Cir. 1953), in which the asserted state remedy had been held to be inadequate. Thus because the issue here was not clearly presented or resolved either in *McNeese* or in *Lane*, those decisions are not dispositive of the instant case.

in the federal court. *Id.* at 183, 81 S. Ct. at 482.

This analysis of *Monroe* is confirmed by an examination of the Court's lengthy discussion of the legislative history it considered as evidencing the third purpose of the statute. Two passages are particularly revealing:

There was, it was said, no quarrel with the state laws on the books. It was *their lack of enforcement* that was the nub of the difficulty. Speaking of conditions in Virginia, Mr. Porter of that State said:

"The outrages committed upon loyal men there are under the forms of law." *Id.* at 176, 81 S.Ct. at 478 (emphasis added, footnote omitted).

The debates were long and extensive. It is abundantly clear that one reason the legislation was passed was to afford a federal right in federal courts because, by reason of prejudice, passion, neglect, intolerance or otherwise, *state laws might not be enforced* and the claims of citizens to the enjoyment of rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be denied by the state agencies. *Id.* at 180, 81 S. Ct. at 480 (emphasis added).

It has been noted elsewhere that the Court's "supplementary" language was not denominated a fourth purpose of the act. Note, *supra*, 82 Harv.L.Rev. at 1489. And it does not state a fourth purpose. The paragraph in which it appears is no more than a holding that the defense had failed to show state remedies truly adequate. Because of such holding, the suggestion, if it is one, that even adequate state remedies need not be exhausted, was not necessary to the decision and therefore is not binding on this Court.

The first purpose, quoted above, should also be examined before the legislative history itself is considered. In student commentaries it has been assumed to refer to any state law alleged to infringe substantive federal rights. *See* Note, *supra*, 82 Harv.L.Rev. at 1496 & *passim*; Comment, *supra*, 68 Colum. L.Rev. at 1204. On the other hand, the opinion would equally permit a conclusion that the Court was referring to only those state laws which deny certain classes or persons access to state remedial procedures, in the same way that the customs and practices mentioned in connection with the second and third purposes make state remedies inadequate. But however the Court's language is construed, it was not necessary for the Court's decision, for no state laws of any kind were there called in question.

■ The setting and legislative history of the Act of April 20, 1871, as well as the occasion for it, thus must be the determining factors on the question of whether to require exhaustion. And these make it clear that the Act was not adopted to supersede state laws affording remedies for derelictions by state officials. Rather, it was enacted to provide a remedy only where one either did not exist or for some reason an existing remedy was unenforced or otherwise insufficient.

It bears remembering that in 1871 when the Ku Klux Act was being debated, federal courts had no general federal question jurisdiction. Such was not granted until the Act of March 3, 1875, 18 Stat. 470, and then only upon the satisfaction of a jurisdictional amount. The protection of federal rights was largely entrusted to the state courts, with ultimate review in the Supreme Court of the United States. This explains the repeated references throughout the debates to the failures of Southern states to open their courts to Republicans and Negroes.

Yet the bill was not enacted out of a belief, currently enjoying some favor, that federal court is the only court in which federally guaranteed rights should be enforced. The members of the 42d Congress believed only that a federal forum should be available where, for whatever reason, state procedures were demonstrably ineffective to their task.

It is in this setting that the purposes stated in *Monroe*, and particularly the reference to a "supplementary" remedy, must be examined. The second and third purposes are entirely consistent with all the legislative debate. The first, however, if it is read broadly, is not. The Congress was not concerned with the possibility that a state or state agency might adopt a statute or regulation arguably infringing some federally guaranteed right. It was worried about the problems which arise when state judges or other officials ignore the Supremacy Clause. State courts, when supplemented by review in the Supreme Court of the United States, had always been considered adequate and competent to resolve alleged inconsistencies between state and federal law, and the debates are replete with assurances that the state courts in the North retained their former adequacy and competency. The purpose of the Congress was not to displace state courts with federal ones, but to supplement state remedies for official misconduct, *providing a federal remedy where state procedures had proved inadequate.* The first purpose as stated in *Monroe* must be read as referring only to state laws which close the courthouse doors to persons whom official conduct has wronged.[4]

Similarly, the "supplementary" language in *Monroe*, if read broadly, would frustrate, not implement, the intent of the Congress. To be sure, a principal congressional purpose was to ensure that official wrongs not go uncorrected. It was important that a remedy be available in federal if not in state court for official breach of duty. But this was only half the task. An equally important goal was to fulfill the federal guarantee to each state of a republican form of government. In this the Congress would fail unless it acted to encourage every state to provide effective remedies of its own for unlawful official conduct.

In holding as I do that § 1983 provides a remedy in federal court only where state procedures are inadequate to afford redress, I do not mean to imply that the 42d Congress could not, had it wished to do so, have provided exclusive or general concurrent jurisdiction in federal court for all or some category of federal question cases. I merely hold that in enacting the predecessor to § 1983 it did not intend to, and that the statute which it enacted should be con-

---

4. As originally introduced and as adopted, § 1 of the Act of April 20, 1871, read as follows:

That any person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected, any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, *any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding,* be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress; such proceeding to be prosecuted in the several district or circuit courts of the United States, with and subject to the same rights of appeal, review upon error, and other remedies provided in like cases in such courts, under the provisions of the act of the ninth of April, eighteen hundred and sixty-six, entitled "An act to pro-

tect all persons in the United States in their civil rights, and to furnish the means of their vindication," and the other remedial laws of the United States which are in their nature applicable in such cases.

17 Stat. 13; Monroe v. Pape, *supra*, 365 U.S. at 181–182 n. 27, 81 S.Ct. 473 (emphasis added). The emphasized language was deleted in the Revised Statutes of 1874. The deletion of almost identical language in the Act of April 9, 1866, in the same codification has been classed by the Supreme Court recently as the presumable deletion of surplusage. Jones v. Alfred H. Mayer Co., 392 U.S. 409, 423 n. 29, 88 S.Ct. 2186, 20 L.Ed. 2d 1189 (1968). The inclusion of such language in the bill as enacted, however, suggests strongly that the Congress intended to impose liability notwithstanding any State law exempting wrongdoers therefrom, not liability to be determined in federal court whenever a state rule is alleged to be inconsistent with some provision of federal law.

strued to effectuate its intent in this regard.

The question of the proper distribution of power between the central government and the states and other regional units in our federal system is one of legislative policy on which I here express no opinion.[5] My role here is to effectuate the policy as declared by the 42d Congress through its enactment of the predecessor of § 1983. Should the 91st or some later Congress determine that present needs require a reformulation of that policy, § 1983 need only be amended. Should this happen, it then can be applied by the courts to effectuate the revised policy. As Mr. Justice Frankfurter has remarked, "It is a statute, not a Constitution, we are expounding." Romero v. International Terminal Operating Co., 358 U.S. 354, 379, 79 S. Ct. 468, 484, 3 L.Ed.2d 368 (1959) (footnote omitted).

It remains to determine whether the remedies available to plaintiff here should be found adequate, a determination which requires a consideration of state law.

### (2) Adequacy of State Remedies

From the Board's decision upholding the Superintendent and the regulation, plaintiff was entitled to appeal to the State Commissioner of Education, and from the Commissioner's decision, to the State Board of Education. Tex.Educ. Code Ann. § 11.13, V.A.T.S.[6] If not satisfied with the State Board's decision, plaintiff might sue it in a district court in Travis County or the Galveston officials in any state district court. Id.[7] Additionally, if his controversy with the local officials involved no questions of fact, he was entitled to bring immediate suit in any state court of competent jurisdiction. Wilson v. Abilene Ind. School Dist., 190 S.W.2d 406 (Tex.Civ. App.—Eastland 1945, writ ref'd, w. o. m.).

If the Monroe decision clarifies anything in this area, it is that the mere recitation just given of the state remedies on the books is insufficient to justify requiring plaintiff to exhaust them. They must appear truly adequate and available, subject only to "the incidental evils which attend upon republican government".[8] A reasonable test would be to ask whether state courts and agencies would hear student claims with as compassionate a concern as a federal court would, and suffer from no shortcoming not shared by federal courts

---

5. This subject, with particular reference to the desirability of requiring exhaustion in suits brought under § 1983, is discussed in the Note and Comment referred to above.

6. (a) Persons having any matter of dispute among them arising under the school laws of Texas or any person aggrieved by the school laws of Texas or by actions or decisions of any board of trustees or board of education may appeal in writing to the commissioner of education, who, after due notice to the parties interested, shall hold a hearing and render a decision without cost to the parties involved, *but nothing contained in this section shall deprive any party of any legal remedy.* (Emphasis added.)
 (b) The decisions of the commissioner of education shall be subject to review by the State Board of Education.

7. Subsection 11.13(c) provides:
 Any person, county, or school district aggrieved by any action of the Central Education Agency may appeal to a district court in Travis County, Texas. Appeals shall be made by serving the commissioner of education with citation issued and served in the manner provided by law for civil suits. The petition shall state the action from which the appeal is taken, and if the appeal is from an order of the State Board of Education, shall also set out the order, or relevant portion thereof. Upon trial the court shall determine all issues of law and fact.
 The proviso to subsection (a) emphasized in note 6, *supra*, preserves the jurisdiction of state district courts over actions against the local officials or district.

8. Remarks of Representative (later Senator) Hoar of Massachusetts, Cong.Globe. 42d Cong., 1st Sess. 334 (Mar. 29, 1871), reprinted in The Reconstruction Amendments' Debates 501 (Va. Comm'n on Const.Govt.1967), and in Note, *supra*, 82 Harv.L.Rev. at 1491 n. 32.

which might prevent them from reaching a just result.

The parties have not cited, and I have not found, any reported Texas case dealing with an attack on a dress code. However, other instances of local action have been frequently litigated in state court.[9] The most recent cases have been brought by students suspended by local boards because of marriage. Carrollton-Farmers Branch Ind. School Dist. v. Knight, 418 S.W.2d 535 (Tex.Civ.App. —Texarkana 1967, writ ref'd n. r. e.); Anderson v. Canyon Ind. School Dist., 412 S.W.2d 387 (Tex.Civ.App.—Amarillo 1967, no writ); Alvin Ind. School Dist. v. Cooper, 404 S.W.2d 76 (Tex.Civ.App. —Houston 1966, no writ). In each of these three cases the district court took jurisdiction in spite of failure to exhaust administrative remedies on the ground that no questions of fact were presented, and granted immediate relief pendente lite. In each case the decision below was affirmed within months (in one case, within weeks). No constitutional issue was reached, the courts

holding that state law did not authorize the action taken.

While the decisions of these three courts of civil appeals did not involve dress codes, they tell much about the adequacy and availability and effectiveness of the remedies provided students by the State of Texas. The courts' eagerness to keep the students in school pendente lite suggests that even if exhaustion of administrative appeals had proved necessary, a request for an order reinstating the students pending the appeal would have been received favorably. Cf. Allen v. Chacon, 449 S.W.2d 289 (Tex.Civ.App. Dallas 1969, no writ) (No. 17,344). Secondly, by overturning actions by local school boards without reaching constitutional arguments, the courts evidenced a special concern to restrict arbitrary school action resulting in student suspensions. Federal courts certainly could do no more. In fact, since the authority of school boards depends so greatly on a construction of state statutes drawn in the broadest terms and seldom construed,[10] federal courts would neces-

9. Cases brought by students include Allen v. Chacon, 449 S.W.2d 289 (Tex.Civ.App. —Dallas 1969, no writ) (No. 17,344); Passel v. Fort Worth Ind. School Dist., 440 S.W.2d 61 (Tex.1969), rev'g 429 S.W.2d 917 (Tex.Civ.App.—Fort Worth 1968); Bishop v. Houston Ind. School Dist., 119 Tex. 403, 29 S.W.2d 312 (1930); Carrollton-Farmers Branch Ind. School Dist. v. Knight, 418 S.W.2d 535 (Tex.Civ.App.—Texarkana 1967, writ ref'd n. r. e.); Anderson v. Canyon Ind. School Dist., 412 S.W.2d 387 (Tex.Civ. App.—Amarillo 1967, no writ); Alvin Ind. School Dist. v. Cooper, 404 S.W.2d 76 (Tex.Civ.App.—Houston 1966, no writ); Wilson v. Abilene Ind. School Dist., 190 S.W.2d 406 (Tex.Civ.App.— Eastland 1945, writ ref'd w. o. m); Shinn v. Barrow, 121 S.W.2d 450 (Tex.Civ.App. —Galveston 1938, writ dism'd). Other cases attacking local action include Cook v. Neill, 163 Tex. 49, 352 S.W.2d 258 (1961); Mission Ind. School Dist. v. Diserens, 144 Tex. 107, 188 S.W.2d 568, 161 A.L.R. 877 (1945); Palmer Pub. Co. v. Smith, 130 Tex. 346, 109 S.W.2d 158 (1937); McIntyre v. Hoblinski, 333 S.W.2d 697 (Tex.Civ.App.—Waco 1960, writ ref'd); Bear v. Donna Ind. School Dist., 74 S.W.2d 179 (Tex.Civ.App.—

San Antonio 1934, writ ref'd); State ex rel. Marrs v. Abshier, 263 S.W. 263 (Tex. Comm.App.1924, jdgmt. adopted); Farrar v. Colorado Ind. School Dist., 444 S.W.2d 204 (Tex.Civ.App.—Eastland 1969, writ ref'd n. r. e.); James v. Board of Trustees, 376 S.W.2d 956 (Tex.Civ. App.—San Antonio 1964, no writ); Daniel v. Dallas Ind. School Dist., 351 S.W.2d 356 (Tex.Civ.App.—El Paso 1961, writ ref'd n. r. e.).

10. The power of the State Board of Education to prescribe rules and regulations is granted in Tex.Educ.Code Ann. §§ 11.24, 11.25(a), (b), which provide:
§ 11.24. General Powers and Duties
(a) The State Board of Education is the policy-forming and planning body for the public school system of the state. It shall also be the State Board for Vocational Education and as such, the board shall have all the powers and duties conferred on it by the various statutes relating to the State Board for Vocational Education.
(b) As one part of the Central Education Agency, the State Board of Education shall have specific responsibility for adopting policies, enacting regulations, and establishing general

sarily be more constrained in reviewing local action. *Cf.* Burford v. Sun Oil Co., 319 U.S. 315, 332, 63 S.Ct. 1098, 87 L. Ed. 1424 (1943). *See also* McKinney v. Blankenship, 154 Tex. 632, 282 S.W.2d 691 (1955).

For these reasons I conclude that the state remedies available to plaintiff were not supplanted by § 1983. He must pursue his claim there, not in federal court.

Alternatively, supposing exhaustion impermissible in the ordinary case, it nevertheless should be required here for two reasons. First, adopting a suggestion by the Supreme Court in King v. Smith, 392 U.S. 309, 312 n. 4, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968), I conclude that exhaustion is required where, as here, plaintiff is not entitled to require the convening of a three-judge court. Moody v. Flowers, 387 U. S. 97, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967). With State remedies prompt and available, no federal interest would be served by permitting plaintiff to disregard the remedies provided by the State.

Secondly, the education of Texas children is not an incidental activity of the State of Texas. It is an activity to which the State has devoted the income from millions of acres of public lands, as well as large sums from its general revenues. More than financial, the State's concern has extended to an eager acceptance of its obligation and responsibility to exercise administrative supervision over the local officials directly responsible for educating the children in each of its more than 1,200 [11] school districts. It has established a central agency as "the policy-forming and planning body for the public school system of the state." Tex.Educ.Code Ann. § 11.24(a).

rules for carrying out the duties placed on it or the Central Education Agency by the legislature.

§ 11.25. Powers and Duties Related to Commissioner of Education

(a) The state commissioner of education shall be the executive officer through whom the State Board of Education shall carry out its policies and enforce its rules and regulations.

(b) The State Board of Education shall have power to pass on appeals from decisions made by the commissioner in applying such rules and regulations.

Boards of independent school districts promulgate rules and regulations under the authority of Tex.Educ.Code Ann. §§ 23.-25, 23.26(b), (d), which provide:

§ 23.25. Powers and Duties

The board of trustees of an independent school district shall have the powers and duties described in this subchapter, in addition to any other powers and duties granted or imposed by this code or by law.

§ 23.26. In General

 * * * * *

(b) The trustees shall have the exclusive power to manage and govern the public free schools of the district.

 * * * * *

(d) The trustees may adopt such rules, regulations, and by-laws as they may deem proper.

Students suspended for violating rules or regulations enacted locally are usually suspended under the authority of Tex. Educ.Code Ann. § 21.301, which provides:

The board of trustees of any school district may suspend from the privileges of the schools any pupil found guilty of incorrigible conduct, but such suspension shall not extend beyond the current term of the school.

This provision does not define "incorrigible conduct," but the courts have supplied this omission with a definition consistent with that found in Tex.Educ.Code Ann. § 21.302, which provides:

The school attendance officer shall proceed in juvenile court against any child within the compulsory school attendance age who is reported to him as being insubordinate, disorderly, vicious, or immoral in conduct, or who persistently violates the reasonable rules and regulations of the school which he attends, or who otherwise persistently misbehaves in such a manner as to render himself an incorrigible.

*See* Bishop v. Houston Ind. School Dist., Shinn v. Barrow, both cited note 9, *supra*. Of course, such a definition necessarily requires a determination whether the rule the student refuses to obey is reasonable.

11. According to a table of the Texas Education Agency printed in 1970–71 Texas Almanac 584.

It has made provision for the enactment, dissemination, and enforcement of state-wide rules and regulations. *Id.* §§ 11.13, 11.24, 11.25(a), (b), quoted note 10 *supra.* It has provided judicial supervision over its educational system which has been effective in keeping administrative action within the law. These administrative and judicial safeguards should be highly respected. A federal court should not intervene in an activity as important to the State as this, except in very exceptional circumstances. *See* Burford v. Sun Oil Co., *supra,* 319 U.S. at 332–334, 63 S.Ct. 1098, *id.* at 335, 63 S.Ct. 1098 (Douglas, J., concurring).

Into this highly important, centrally supervised educational operation plaintiff has called this Court. Why? Because he disagrees with the educational policy adopted by the local administrators of the Galveston Independent School District. Although his complaint is cast in constitutional terms, his attorney's opening statement here is more descriptive of the question now before this Court: "[T]he real issue," counsel argued, is "What is best for our students?"

 But even if this query by counsel is taken as hyperbole, the issue here remains one of policy. Whatever label plaintiff gives his complaint, his basic assertions are that the freedom to choose his hair style is constitutionally protected, and that the dress code as applied to restrict his choice is unreasonable. Resolution of the first of these propositions is not entirely without its difficulties. *See generally, e. g.,* Davis v. Firment, 269 F.Supp. 524 (E.D.La. 1967), aff'd per curiam, 408 F.2d 1085 (5th Cir.1969); Pritchard v. Spring Branch Ind. School Dist., 308 F.Supp. 570, S.D.Tex., Jan. 22, 1970 (Hannay, J.); Note, Symbolic Conduct, 68 Colum. L.Rev. 1091, 1109–17 (1968); Developments in the Law—Equal Protection, 82 Harv.L.Rev. 1065, 1160–83 (1968). But assuming that plaintiff can establish that the right he asserts is constitutionally protected, he must still show that

the dress code as it affects such right unreasonably infringes it. Tinker v. Des Moines Ind. Community School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L. Ed.2d 731 (1969); United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); Ferrell v. Dallas Ind. School Dist., 392 F.2d 697 (5th Cir.), cert. denied, 393 U.S. 856, 89 S.Ct. 98, 21 L.Ed.2d 125 (1968); Blackwell v. Issaquena County Board of Educ., 363 F.2d 749 (5th Cir.1966); Burnside v. Byars, 363 F.2d 744 (5th Cir.1966).

 Restriction of the exercise of a constitutional right may be justified by the need to promote any substantial governmental interest. *Tinker, supra;* United States v. O'Brien, *supra;* General Order on Judicial Standards of Procedure and Substance, 45 F.R.D. 133, 145 (W.D.Mo.1968) (en banc); Wright, The Constitution on the Campus, 22 Vand.L.Rev. 1027, 1041–42 (1969). However, when school officials are restricting the constitutional rights of students, the substantiality of the governmental interest cannot be determined without a consideration of educational policy. Concurring specially in *Ferrell, supra,* Judge Godbold of the Court of Appeals for the Fifth Circuit stated forcibly the interrelation between educational policy and constitutionality:

A school may not stifle dissent because the subject matter is out of favor. Free expression is itself a vital part of the educational process. But in measuring the appropriateness and reasonableness of school regulations against the constitutional protections of the First and Fourteenth Amendments the courts must give full credence to the role and purposes of the schools and of the tools with which it is expected that they deal with their problems, and careful recognition to the differences between what are reasonable restraints in the classroom and what are reasonable restraints on the street corner.

392 F.2d at 704–705. In this case, if the dress code is justified by a substantial

governmental interest of the Galveston Independent School District, it is constitutional. If it is not so justified, it is unconstitutional. But because the District's principal governmental interest is educational, the reasonableness of and justification for the dress code can only be considered with reference to educational policy. Resolution of plaintiff's constitutional claims necessarily requires an evaluation of asserted educational policy.[12]

The record developed at the hearing in this case illustrates the importance of policy considerations and the necessity of requiring students to present their claims in available and adequate state administrative and judicial procedures. The school administrators, all professionals, gave three educational bases for the Galveston Dress Code and its constituent hair regulation. First, their experience in Galveston and elsewhere had caused them to believe that without some restriction on dress and hair style, teachers would lose that control over their students which they considered necessary if they were to hold their students' attention and teach them. Secondly, they deemed it to be their responsibility to train students in the customs and mores pertaining to dress, appearance, taste, and public etiquette considered to be acceptable by the predominant part of our society, and they believe that the enforcement of liberal, but minimum, standards of dress and grooming is the best way to fulfill this duty. Thirdly, they believed that permitting students to participate in the formulation and amendment of the dress code and other school regulations is a valuable means of teaching students citizenship and the working of the democratic system. They testified to their belief that the educational value of the dress code would be negligible were exceptions to be allowed in cases like plaintiff's. Respectable authority, including the opinion of the United States Supreme Court in Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954), supports their testimony.[13]

---

12. At the commencement of the hearing held to consider plaintiff's request for injunctive relief, his attorney attempted to waive all of his non-federal claims. Plaintiff's basic contention, however, is that the regulation he objects to is unreasonable in the face of his constitutional rights. Under Texas law, regulations adopted by local school boards, to be valid, must be "reasonable, not arbitrary or discriminatory, nor invasive of parental rights and authority." Wilson v. Abilene Ind. School Dist., 190 S.W.2d 406, 410 (Tex.Civ.App.—Eastland 1945, writ ref'd w. o. m.). This Court will not, unless constrained by unambiguous state authority to the contrary, conclude that a state statute authorizing the promulgation of reasonable regulations only, permits local school officials to enforce rules in violation of the federal constitution. Issues of state law, therefore, necessarily inhere in claims like plaintiff's.

13. In Brown the Supreme Court, per Mr. Chief Justice Warren, declared:

Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. *Today, it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment.* In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.

347 U.S. at 493, 74 S.Ct. at 691 (emphasis added). This high purpose was reiterated recently, with particular reference to the needs of children in the inner cities, by the President's Commission on Law Enforcement and Administration of Justice in its report, The Challenge of Crime in a Free Society, at 63–74 (1967). *See also* Richards v. Thurston, 304 F.Supp. 449, 454 (D.Mass.1969)

The manner in which students in public high schools should be educated is a subject for local determination. It is a subject foreign to the competence and expertise of the federal judiciary. Whether or not some measure of conformity is educationally sound, and if so to what degree, is not an appropriate question for resolution by federal judges. Such decisions must be left to the public servants to whom our nation has entrusted its system of public education. Stevenson v. Wheeler County Bd. of Educ., 306 F.Supp. 97, S.D.Ga., Nov. 17, 1969. For the State of Texas, these are the *elected* State Board of Education and local Boards of Trustees, together with their duly appointed professional administrators. Plaintiff is not without a remedy to influence the manner in which students in the public high schools of Galveston are educated, which would include a change in the Galveston Dress Code. As in all such areas of governmental policy, plaintiff's remedy is at the ballot box in Trustee elections, in this instance through the vote of his parents, one of whom brings this suit.

The Commissioner of Education and State Board of Education of the State of Texas stand ready to determine whether the local action taken here comports with the State's educational policy. The district and appellate courts of the State of Texas stand ready promptly to determine whether the local action taken here is authorized by state law and permitted by the state and federal constitutions. An erroneous decision by a state court on a federal constitutional issue is subject to correction in the Supreme Court of the United States. Except upon a convincing showing of severe hardship, students must be required to give these arms of the State of Texas the opportunity to regulate the conduct of the state's local school boards and administrative officials. Because plaintiff has not given the Central Education Agency

and the State courts the opportunity to do so, his complaint must be dismissed.

In the further alternative, supposing that § 1983 never permits a court to require exhaustion of judicial remedies, I conclude that at least the administrative remedies available to students should be exhausted. Constitutional claims like plaintiff's necessarily involve a determination of which educational policy is most desirable. The Legislature of the State of Texas has expressly charged the State Board of Education with the duty to formulate and implement the educational policy of the State. Tex.Educ.Code Ann. § 11.24, quoted note 10 *supra*. Were I to permit plaintiff to come straight to federal court without pursuing his claim before the State Board, I would usurp the Board's responsibility in a matter of great domestic concern to it and the State of Texas. Such action by a federal court would constitute a gross arrogation of jurisdiction. *Cf.* Burford v. Sun Oil Co., *supra*, 319 U.S. at 332–334, 63 S.Ct. 1098; *id.* at 335, 63 S.Ct. 1098 (Douglas, J., concurring).

### c. *Abstention*

Finally, supposing that § 1983 forbids requiring the exhaustion of any State remedies, it becomes my duty to abstain. Burford v. Sun Oil Co., *supra*. No case, except perhaps *Burford* itself, could fit more precisely than this one, the tests for abstention there formulated. Involved is a domestic activity of more importance to the State of Texas than the conservation of its mineral resources—the development of its greatest resource, its children. "The federal government, for the present at least, has chosen to leave the principal regulatory responsibility with the states, but does supplement state control." 319 U.S. at 319, 63 S.Ct. at 1100 (footnote omitted).

State administrative and judicial review of issues affecting education is prompt, effective, and thorough. Al-

("Aesthetic considerations having a rational objective foundation may also properly be taken into account by a representative of a state in determining policy.").

most all cases brought by students, though they be framed in constitutional terms, necessarily raise issues of state law, as to both educational policy and the power of local officials. Texas courts have accepted their responsibility willingly, affording meaningful review of administrative decisions and confining administrative discretion within the bounds established by law. In the words of the Supreme Court in *Burford*,

> As a practical matter, the federal courts can make small contribution to the well organized system of regulation and review which the Texas statutes provide. Texas courts can give fully as great relief, including temporary restraining orders, as the federal courts. Delay, misunderstanding of local law, and needless federal conflict with the State policy, are the inevita-

ble product of this double system of review.

*Id.* at 327, 63 S.Ct. at 1104. Finally, the equitable considerations with which the Court concluded its opinion read as though written for the instant case.[14] A federal court has no business interfering with this State's educational system in a case like this.[15] Federal interests are amply protected by the opportunity for direct review in the United States Supreme Court of all State judicial decisions.[15a]

### 3. *Conclusion*

In sum, I am convinced that students with claims against local school officials in Texas are not entitled to haul them into federal court to review their actions. Such claims should be submitted to the appropriate State officials for review, with judicial review, if at all, only

14. These questions of regulation of the industry by the State administrative agency, whether involving gas or oil prorationing programs or Rule 37 cases, so clearly involve basic problems of Texas policy that equitable discretion should be exercised to give the Texas courts the first opportunity to consider them. "Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies, * * * These cases reflect a doctrine of abstention appropriate to our federal system whereby the federal courts, 'exercising a wise discretion', restrain their authority because of 'scrupulous regard for the rightful independence of the state governments' and for the smooth working of the federal judiciary. * * * This use of equitable powers is a contribution of the courts in furthering the harmonious relation between state and federal authority without the need of rigorous congressional restriction of those powers." Railroad Commission [of Texas] v. Pullman Co., *supra*, [312 U.S. 496,] 500, 501 [61 S.Ct. 643, 645, 85 L.Ed. 971] [1941].

The State provides a unified method for the formation of policy and determination of cases by the Commission and by the state courts. The judicial review of the Commission's decisions in the state courts is expeditious and adequate. Conflicts in the interpretation of state law, dangerous to the success of state policies, are almost certain to result from the intervention of the lower federal courts. On the other hand, if the state procedure is followed from the Commission to the State Supreme Court, ultimate review of the federal questions is fully preserved here. *Cf.* Matthews v. Rodgers, 284 U.S. 521 [52 S.Ct. 217, 76 L.Ed. 447] [1932]. Under such circumstances, a sound respect for the independence of state action requires the federal equity court to stay its hand. 319 U.S. at 332–334, 63 S.Ct. at 1106–1107 (footnote omitted).

15. As noted in connection with the discussion of exhaustion, it is possible that an occasional exceptional case may arise in which a federal court would feel compelled to intervene. Such may be Richards v. Thurston, 304 F.Supp. 449 (D. Mass.1969), decided recently by Judge Wyzanski, although the Texas marriage cases suggest that Texas courts would look as disfavorably as he on attempts to dictate the personal habits of students solely for reasons of personal prejudice.

15a. The doctrine of abstention was reaffirmed by the Supreme Court in Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (Feb. 25, 1970), a case quite similar to the instant case. For the reasons stated by the Court in *Reetz*, as well as those set out in *Burford*, I would grossly abuse my discretion were I not to abstain pending resolution by state courts of the issues of state law presented by plaintiff's claim.

**1050**

in the State courts, subject to correction of the unique case in the Supreme Court of the United States.[16]

For the foregoing reasons, which to the extent they may be inconsistent therewith, supersede those given orally from the bench,

(1) Plaintiff's claim in its entirety must be dismissed for failure to allege exhaustion of state administrative and judicial remedies, or in the alternative, because of my duty as a court of equity, to abstain; and in the further alternative,

(2) Plaintiff's claim against the District, Ball High School, and the respective individual defendants in their official capacity must be dismissed.

Counsel for defendant may prepare a suggested form of order consistent with the views expressed in this Memorandum Opinion and assessing costs against plaintiff.

All facts set out in this Memorandum Opinion, to the extent that they may be relevant to the jurisdictional issues discussed herein, are hereby found to be facts for the purposes of such issues. This finding, however, is not intended to be, and is not a finding of any fact concerning the merits of this cause, nor a finding of any fact with reference to any other motion of either party now pending. The above similarly constitutes conclusions of law with respect to such issues, to the extent it may be relevant to their disposition. The preliminary oral findings of fact and conclusions of law pertaining to the merits of this case, announced from the bench at the close of oral argument, are hereby vacated.

---

16. I am aware of only one other judicial attempt to examine the need for exhaustion comprehensively. Richards v. Thurston, 304 F.Supp. 449, 455–457 (D. Mass.1969). Judge Wyzanski there gave four reasons for declining to require exhaustion: the importance of the constitutional issues presented, the malicious, arbitrary character of the official conduct, the inadequacy of state remedies, and the class ramifications of the plaintiff's claim. Except for the first, none of these factors is present here: the official action was taken in good faith, state remedies are, if anything, better than federal ones, and plaintiff by his own admission represents no class. Thus the question which Judge Wyzanski there could leave unanswered, the facts here require me to resolve.