**Daniel ALBERDA et al., Plaintiffs,**

v.

**John NOELL et al., Defendants.**

**SWARTZ CREEK TEACHERS ASSO-
CIATION et al., Plaintiffs,**

v.

**SWARTZ CREEK COMMUNITY
SCHOOLS et al., Defendants.**

**John METZELAAR a Minor, et al.,
Plaintiffs,**

v.

**MILAN PUBLIC SCHOOLS et al.,
Defendants.**

**Steve CHMELA et al., Plaintiffs,**

v.

**Martin SVILAND et al., Defendants.**

Civ. A. No. 3069, N. D.
Civ. A. No. 454, S. D. Flint.
Civ. A. Nos. 35357, 35955, S. D.

United States District Court,
E. D. Michigan.

Feb. 19, 1971.

---

Paul Doner, Director Bay-Midland Legal Aid Society, James G. Orford, Ralph I. Selby, Bay City, Mich., for Daniel Alberda and others.

William M. Lambert, Bay City, Mich., for John Noell and others.

Wallace K. Sagendorph, Erwin B. Ellmann, Detroit, Mich., for Swartz Creek Teachers Assn. and others.

Frederick E. Salim, Flint, Mich., for Swartz Creek Community Schools and others.

David I. Goldstein, Washtenaw County Legal Aid Society, Fred S. Steingold, Ann Arbor, Mich., for John Metzelaar and others.

Joseph Delaney, Flint, Mich., for Milan Public Schools and others.

Ronald Reosti, Detroit, Mich., for Steve Chmela and others.

Arthur Heidt, Jr., Westland, Mich., for Martin Sviland and others.

## OPINION

ROTH, District Judge.

These four cases involve school matters relating to students' grooming styles, a teacher's facial grooming, and a truancy suspension. For the purpose of deciding whether we should entertain jurisdiction of them in a United States District Court, the circumstantial differences we consider of no decisive moment. With some poetic license we classify them as "hair" cases, and in the interest of judicial economy, propose to deal with them in a single ruling.

In filing these cases the plaintiffs have punched various constitutional and statutory buttons: the major keys being the 1st, 4th, 5th, 6th, 8th, 9th, 10th and 14th Amendments to the United States Constitution; the minor keys being Title 28, United States Code, Sections 1343(3) and (4), 2201 and 2202, and Title 42, United States Code, Sections 1975, 1981 and 1983. There is no indication in any of these cases that the plaintiffs, or any one of them, have sought relief from the courts of the State of Michigan, much less any claim that they have resorted to such courts and have been improperly denied relief.

It would appear from the number of "hair" cases in the federal reports that many federal courts have responded with a Pavlovian-type conditioned reflex, and considerable alacrity, in exercising jurisdiction of claims arising from dress and grooming codes or regulations. It may be that the discipline of training of federal judges has conditioned them to react almost automatically, and in a favorable way, to what are purely rhetorical and, perhaps, faulty or highly questionable assertions of constitutional violations. It may be that this kind of case offers federal judges a pleasurable escape from the more usual, garden-variety federal cases—a welcome change of judicial diet, as it were. Whether this use of federal judicial man-hours in cases of this class is justified, necessary or required is really our basic question, as we see it (conceding that our vision is less than perfect).

It should be noted that these cases raise havoc with our calendars requiring as they do, interruptions of our regularly scheduled matters for the purpose of hearing applications for restraining orders and preliminary injunctions, in what are alleged, as they always are, emergency situations. Meanwhile, "back at the ranch" or at our ordinary chores, we are under the gun to expedite our disposition of criminal cases, school desegregation cases, old civil cases, multiple district cases, and the like.

We begin our discussion of what we have chosen to call "hair"[1] cases by

---

1. We mean thereby cases involving disputes arising from the enforcement or threatened enforcement of dress, grooming and attendance rules or regulations.

making a brief survey of the "territory."[2] The estimated total educational enrollment in the United States for the 1971–72 school year will be almost 60 million, with over 15 million in secondary schools. In 1969–70 there were over 27,000 public secondary schools. In the current school year over 40 billion dollars is being spent on public education; of this amount the federal government is supplying some two and one-half billion, the states 15 and one-half billions, and local contributions amount to over 20 billions.[3]

In the State of Michigan there are over 800 public high schools in 686 school districts. We say nothing of the number of junior high schools and elementary schools. To cope with this class of potential litigation the State of Michigan is allotted 12 United States District Judges, whereas the State of Michigan provides manpower in terms of 119 circuit judgeships. By a recent count the United States District Court for the Eastern District of Michigan had pending before it more than 20 cases of this variety.

In searching for guidance we look in vain to the United States Supreme Court for it appears reluctant to furnish us with guidelines in the area of hair-styling and dress, although the opportunity has been more than once presented. See Ferrell v. Dallas Independent School District, 392 F.2d 697, cert. denied, 1968, 393 U.S. 856, 89 S.Ct. 98, 21 L. Ed.2d 125, and Breen v. Kahl, 419 F.2d 1034, cert. denied 1970, 398 U.S. 937, 90 S.Ct. 1836, 26 L.Ed.2d 268. Between the dates of these rulings the Court handed down its decision in Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731, 1969, and took occasion to say:

> "The problem posed by the present case does not relate to regulation of the length of skirts or the type of clothing, to hair style, or deportment. Cf. Ferrell v. Dallas Independent School District, 392 F.2d 697 (C.A. 5th Cir. 1968); Pugsley v. Sellmeyer, 158 Ark. 247, 250 S.W. 538 [30 A.L.R. 1212] (1923)."

Mr. Justice Hugo Black in his dissent in *Tinker*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731, at 749 expressed the view that school matters are best and most properly left to local school authorities and to the states. The public press reports that on February 11, 1971, Mr. Justice Black said that the Constitution does not give high school students the right to wear their hair long. He is quoted as saying that:

> "Surely the federal judiciary can perform no greater service to the nation than to leave the states unhampered in the performance of their purely local affairs. Surely few policies can be thought of in which states are more capable of deciding than the length of hair of schoolboys." (See Chicago Sun-Times, Feb. 11, 1971.)

Justice Black is reported to have added that "lawyers should not be pressing the Supreme Court with 'emergency motions' claiming the nation will be in crisis unless long hair is allowed." [4]

If a layman's opinion is proper in this setting we might observe that each head of hair, like each fingerprint, is different. Is it a potential federal case whenever a conflict develops between rule and hair? Must we have national standards for hair-styling and dress? Can we not

---

2. As someone has said, there is a strong suspicion that the officer who ordered the Charge of the Light Brigade was not there looking at the territory.

3. New York Times Encyclopedic Almanac, 1971, p. 516, et seq.

4. Because allusions to grooming styles of historical figures occur in a number of reported cases, let us note that it profits us little to be reminded that Samson symbolized his virility by the manner in which he wore his hair or that President Lincoln and Chief Justice Hughes wore beards. None of these grooming styles, so far as we know, appeared in a public high school setting.

leave room for variety in our national life, and allow for differences in what are thought proper standards of appearance for school children of, for example, Alaska and Alabama? And what of keeping such standards current? We can be fairly certain that what is popular now will not be in the future, just as it was not in the past.

We strongly suspect that if the Supreme Court of the United States decides to get into the barbering business, and unless it holds simply, in the alternative, either that public school children may wear their hair and dress themselves as they wish,[5] or that these matters are more properly left to the states, all federal courts will find themselves in another judicial morass like that in the field of obscenity. The avalanche of litigation in that field should be a forewarning of the portending mass of school litigation which most surely will engulf us.

 It is hornbook law that the Constitution and laws of the United States made in pursuance thereof are the supreme law of the land, and judges in every state are bound thereby, anything in the laws of the state to the contrary notwithstanding. And under Clause 2, Article VI, of the Constitution, the interpretation placed on the Constitution and laws of the United States by decisions of the Supreme Court of the United States is controlling upon state courts and must be followed even though such decisions are inconsistent with its prior decisions. It is our observation that the courts of the State of Michigan are following these basic decisional guidelines and protecting the constitutional rights of their litigants every working day. In consequence, as we see it, when a federal court entertains jurisdiction in such matters as are before us in these cases, it is saying, in effect, that local authorities and state courts are incompetent to deal with such things. This is an unnecessary and unjustified reflection on the state courts. We know of no special training or peculiar qualification of the federal bench which especially fits it for handling this litigation.[6]

Recent years have seen an alarming increase in resort to federal courts.[7] It has prompted Mr. Chief Justice Warren E. Burger, in his "State of the Federal Judiciary" message, delivered before the American Bar Association, at St. Louis, Missouri, on August 10, 1970, to point out:

"As to the future I can do no more than emphasize that the federal court system is for a limited purpose and lawyers, the Congress and the public must examine carefully each demand they make on that system. People speak glibly of putting all the problems of pollution, of crowded cities, of consumer class actions and others in the federal courts. *We should look more to state courts familiar with lo-*

5. In Breen v. Kahl, supra, the Court said: "The right to wear one's hair at any length or in any desired manner is an ingredient or personal freedom protected by the United States Constitution."

In Richards v. Thurston, 1 Cir., 424 F.2d 1281, the Court said: "We conclude that within the commodious concept of liberty, embracing freedoms great and small, is the right to wear one's hair as he wishes." (It is noted that the trial court in Richards v. Thurston, D.C., 304 F.Supp. 449, filed four opinions, three of them supplemental ones.)

6. Karr v. Schmidt, from the 5th Circuit, ruling by Circuit Justice Black, On Motion to Vacate a Stay of Injunction Pending Appeal, February 11, 1971: "There

can, of course, be honest differences of opinion as to whether any government, state or federal, should as a matter of public policy regulate the length of haircuts, but it would be difficult to prove by reason, logic, or common sense that the federal judiciary is more competent to deal with hair length than are the local school authorities and state legislatures of all our 50 States." 401 U.S. 1201, 91 S.Ct. 592, 27 L.Ed.2d 797.

7. See report of the Director of the Administrative Office of the United States Courts, for the period July 1 through September 30, 1970, page 7: "The most substantial increases in civil filings were under Federal question, up 28% over the same quarter a year ago."

*cal conditions and local problems."* (Emphasis supplied.)

The Chief Justice also called for a study of the "existing jurisdiction of federal courts with special attention to proper allocation of judicial functions as between state and federal courts." And in a recent case, Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L. Ed.2d 515, 1971, the Chief Justice, in a dissent, made these comments:

> "Since no one could reasonably think that the judges of Wisconsin have less fidelity to due process requirements of the Federal Constitution than we do, this case is, for me, a classic illustration of one in which we should decline to act until resort to the state courts has been exhausted."

> \*　\*　\*　\*　\*　\*

> "This Court has an abundance of important work to do, which, if it is to be done well, should not be subject to the added pressures of non-urgent state cases which the state courts have never been called on to resolve."

Few public interests have a higher claim upon the discretion of a federal court than the avoidance of needless friction with state policies. See Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971, at 974.

As Mr. Justice Douglas said, in Reetz v. Bozanich, 397 U.S. 82, 85, 90 S.Ct. 788, 789, 25 L.Ed.2d 68, at page 71: (Quoting from City of Meridian v. Southern Bell Tel. & Tel. Co., 358 U.S. 639, 79 S.Ct. 455, 3 L.Ed.2d 562)

> "[The] proper exercise of federal jurisdiction requires that controversies involving unsettled questions of state law be decided in the state tribunals preliminary to a federal court's consideration of the underlying federal constitutional questions."

In the enactment of the Civil Rights Act, 42 U.S.C. 1981, et seq., Congress was not concerned with the possibility that a state or state agency might adopt a statute or regulation arguably infringing some federally guaranteed right. It was concerned about the problems which arise when state judges or other officials ignore the Supremacy Clause. State courts, when supplemented by review in the Supreme Court of the United States, are adequate and competent to resolve alleged inconsistencies between state and federal law. The Act was enacted to provide a remedy only where one either did not exist or for some reason an existing remedy was not enforced or otherwise was insufficient. Schwartz v. Galveston Independent School Dist., D.C., 309 F.Supp. 1034.

While our Circuit Court has not considered the issue of abstention or deference, we read its opinion in Jackson v. Dorrier, 6 Cir., 424 F.2d 213, 1970, to indicate its preference of *Ferrell, supra,* to *Breen, supra;* and we consider its allusions to Epperson v. Arkansas, 393 U. S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228, and *Tinker, supra,* as indicative of the view that local school matters should be left to local school authorities and the states. We consider Bonner v. Texas City Independent School District of Tex., D.C., 305 F.Supp. 600, Schwartz v. Galveston Independent School Dist., D.C., 309 F. Supp. 1034, and Bouse v. Hipes, D.C., 319 F.Supp. 515, to be the better reasoned "hair" cases. To paraphrase Mr. Chief Justice Burger in Wisconsin v. Constantineau, *supra,* we believe we should not permit these plaintiffs to "shortcut" the courts of the State of Michigan, by bringing their complaints to this Court. We believe that the Chief Justice had such cases as these in mind when he said in the last mentioned case, that to entertain these cases in a federal district court is the "negation of sound judicial administration—and an unwarranted use of a limited judicial resource."

We find here no right, considered especially important by the federal judiciary, threatened; we see no irreparable harm flowing from declining federal jurisdiction. In short, we find that the state's strong interest in the field of education outweighs whatever interest in

the subject matter may be said to be federal. On balance then, it appears to us, that the wise course for us to follow is to defer to the state, its school authorities and its courts. The ingenuity of counsel and litigants in framing these controversies in constitutional terms should not be permitted to operate to foist these cases upon the severely beset and overburdened federal courts.

 We must do more than wring our hands when we on the federal bench are imposed upon to entertain cases best left to the states. This Court takes a step in that direction and holds that the above-entitled cases do not present substantial federal questions, and that this Court should defer to the state and its courts. It is time that the public, litigants and counsel be disabused of the notion, currently enjoying great favor, that a federal court is the only court in which federally guaranteed rights can or should be enforced. For almost ninety years of history, that is, until 1875, there was no general grant of "federal question" jurisdiction to the federal courts; such cases could only be brought in the state courts. It is interesting to note that in the course of Congressional debates, which culminated in the passage of the Judiciary Act of 1789, it was argued that there was a duty to confer the full judicial power granted by the Constitution on the federal courts. That view was rejected and down to the present the entire judicial power has not been vested in the federal courts. While under that Act Congress did confer diversity jurisdiction on the circuit courts, no jurisdiction was conferred on such courts in cases arising under the Constitution or laws of the United States. These actions may be dismissed. Appropriate orders may be submitted.

To avoid any misunderstanding of the Court's ruling, we make it plain that we have not considered the merits of these complaints. We hold only that these controversies are best and most appropriately resolved by the administrative and judicial arms of the State of Michigan.