Richard E. EGNER et al., Plaintiffs,

v.

TEXAS CITY INDEPENDENT SCHOOL DISTRICT et al., Defendants.

Civ. A. No. 71–G–169.

United States District Court,
S. D. Texas,
Galveston Division.

Feb. 11, 1972.

**932**

James P. Simpson, and Barney L. Mc-Coy, of Simpson & Morgan, Texas City, Tex., for plaintiffs.

Holman Lilienstern, of Neugent, Lilienstern & Douvry, Texas City, Tex., for defendants.

NOEL, District Judge.

## MEMORANDUM AND ORDER

### I. *Preface*

This is a secondary school discipline case initiated by a high school student, joined by his parents, to challenge the action of defendant school district and certain of its administrators and trustees. Having been suspended from school attendance for five days, plaintiff brought suit in the District Court of Galveston County, Texas, 56th Judicial District of the State of Texas, seeking to restrain the imposition of the suspension and to establish by declaratory judgment the invalidity of a school district rule relating to student publications. On the day that suit was filed, the state court entered a temporary restraining order requiring plaintiff's retention in school pending a hearing on the merits. Before such a hearing could be held, defendants timely removed the suit to this Court. 28 U.S.C. § 1441. Contending that the case was improperly removed, plaintiffs have filed a motion to remand.

The propriety of removal is assessed by consideration of the complaint and the facts alleged therein. Gully v. First National Bank of Meridian, 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936). It appears from the instant complaint that plaintiff participated in the publication of a pamphlet which he distributed to certain of his fellow students during a bus trip with the school band. He did this without seeking the school principal's prior approval of the publication, as required by a rule of the school district contained in the "Student-Parent-Faculty Handbook".[1] In response to this alleged infraction, the school principal advised plaintiff and two other students that they were to be suspended. Shortly thereafter, the district superintendent formally suspended plaintiff for a period of five days. State litigation ensued immediately and it is unclear from the present record whether the district board of trustees has acted on the matter. The legal gravamen of the complaint appears on the third page of plaintiff's "First Amended Original Application for Temporary Restraining Order, Temporary Injunction and Permanent Injunction", filed in the state court which reads:

> Plaintiffs allege that the action of the named administrative officials of the Texas City Independent School District in challenging the right of Plaintiff, Richard Edward Egner to publish and distribute said newspaper was in direct violation of the First and Fourteenth Amendments to the United

---

1. As quoted in the complaint, this handbook provides that:

"Duplicated, written, or printed materials, handbills, photographs, pictures, films, tapes, or other visual or auditory materials shall not be sold, circulated, or distributed on any school building in the Texas City Independent School District without explicit approval of the principal of that school. Any student violating this policy may be suspended by the principal and/or superintendent until Board action can be taken. No person shall enter on any school campus to distribute such materials without explicit permission of the principal and/or superintendent."

States Constitution, of Title 42, Section 1983, U.S.C., and of Article I, Section 8 of the Constitution of the State of Texas [Vernon's Ann.St.]. Plaintiffs further allege that said newspaper was in no way a violation of any laws of the State of Texas or of the United States, and that the same cannot be classified as obscene, pornographic, defamatory, subversive or in any manner illegal.

Defendants contend that plaintiff's reliance upon the alleged deprivation of federal constitutional rights, coupled with his invocation of Section 1983 which in general terms makes such deprivations actionable,[2] brings the suit within the original jurisdiction of this Court and *renders it removable*. In relevant part, the removal statutes provide that "(i)f at any time before final judgment it appears that the case was removed improvidently and without jurisdiction, the district court shall remand the case, and may order the payment of just costs." 28 U.S.C. § 1447(c). Therefore, it is necessary to consider whether jurisdiction over the instant case exists and if so, whether it should be exercised. If not, remand is indicated.

## II. *Jurisdiction*

The jurisdictional counterpart of Section 1983 is 28 U.S.C. § 1343(3).[3] As the statute conferring jurisdiction in no way broadens the cause of action, Harkless v. Sweeny Independent School District, 300 F.Supp. 794, 807 (S.D.Tex.

1969), rev'd on other grounds 427 F.2d 319 (1970), certiorari denied 400 U.S. 991, 91 S.Ct. 451, 27 L.Ed.2d 439 (1971), it is necessary initially to inquire whether a claim cognizable in federal court has been stated under Section 1983. As the instant suit was promptly wrested from the state court in which it was filed and was proceeding toward trial, it is obvious from the record as it stands that an available state judicial remedy has not been exhausted. When exhaustion of state remedies is required, the failure to do so raises an impediment which is jurisdictional in nature; therefore, this secondary school discipline suit is not maintainable in federal court under Section 1983, and was improvidently removed, and must accordingly be remanded. In the alternative, if this should not be a proper case for application of the doctrine of exhaustion, it is nevertheless a case requiring application of the doctrine of judicial abstention. Schwartz v. Galveston Ind. School District, 309 F. Supp. 1034 (S.D.Tex.1970).

### A. *The doctrine of exhaustion of State remedies*

#### 1. The *Schwartz* decision

Defendant contends that *Schwartz* is no longer a viable precedent because it has been singled out for criticism on several occasions in subsequent opinions of the Court of Appeals for the Fifth Circuit. See Hall v. Garson, 430 F.2d 430 (5th Cir. 1970);[4] Moreno v. Henckel, 431 F.2d

---

2. 42 U.S.C. § 1983 (1964) codifies Section One of the Civil Rights Act of 1871 § 1, ch. 22, § 1, 17 Stat. 13, and provides:
   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

3. 28 U.S.C. § 1343(3) provides in relevant part:

   The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
   (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States.

4. In *Hall*, it is said that *Schwartz* "exhaustion requirement cannot survive." 430 F.2d at 437.

1299 (5th Cir. 1970) ;[5] Hobbs v. Thompson, 448 F.2d 456 (5th Cir. 1971).[6] The evaluation of this contention must begin with a careful statement of what *Schwartz* did and did not hold.

■ Like the case at bar, *Schwartz* was a secondary school discipline case. There, a high school student and his parents challenged the constitutional validity of a hair style regulation. It was alleged that plaintiff's threatened suspension for violation of this rule was an abridgment of his federal constitutional rights giving rise to a cause of action under Section 1983. In granting a motion to dismiss, this Court held that an aggrieved Texas school student, *whose state administrative and judicial remedies are demonstrably adequate and available both in theory and practice,* may not proceed in federal court as though the Section 1983 remedy were a mere electable alternative to those state remedies. This narrow holding followed from a close reading of the leading case of Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and quite obviously should not be taken to mean that exhaustion of state remedies is in all cases, or even in many cases, a jurisdictional prerequisite to suit under Section 1983.

2. *The United States Supreme Court guidelines—Monroe v. Pape and Askew v. Hargrave*

*Monroe* involved a Section 1983 suit brought by an Illinois family to recover damages for the brutal raiding and sacking of their home by thirteen Chicago police officers. Having made its way to the Supreme Court, the case presented an occasion to expound a broadly worded statute which had theretofore been narrowly interpreted and seldom litigated. After careful consideration of the statute's Reconstruction origins, Mr. Justice Douglas, writing for the Court, concluded that Section 1983 was designed to afford a federal forum for the vindication of federal constitutional rights in three basic situations: (1) "First, [§ 1983] might, of course, override certain kinds of state laws." 365 U.S. at 173, 81 S.Ct. at 477. (2) "Second, it provided a remedy where state law was inadequate." Id. (3) "The third aim was to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice." 365 U.S. at 174, 81 S.Ct. at 477.

Thus were set out the three guidelines for defining the proper ambit of Section 1983. The first relates at most to discriminatory state laws and is not here involved. In view of the second and third statutory purposes, it would appear obvious that the scope of the statute is necessarily dependent to some degree upon the existence and adequacy of the state remedial scheme. However, at a point later in the *Monroe* opinion, language was used which has since been a fertile source of scholarly controversy. See, e. g., Note, Exhaustion of State Remedies Under the Civil Rights Act, 68 Colum.L.Rev. 1201 (1968) ; Note, Limiting the Section 1983 Action in the Wake of Monroe v. Pape, 82 Harv.L.Rev. 1486 (1969). The *Monroe* Court said:

> It is no answer that the State has a law which if enforced would give relief. *The federal remedy is supplementary to the state remedy,* and the latter need not be the first sought and refused before the federal one is invoked. Hence the fact that Illinois by its constitution and laws outlaws unreasonable searches and seizures is no barrier to the present suit in the federal court (emphasis added).

365 U.S. at 183, 81 S.Ct. at 482. There are two ways to construe the foregoing quotation. First, it might be thought that the word "supplementary" was used in the sense of "supersessive" or "sub-

---

5. In *Moreno*, the Court cites *Schwartz* as exemplary of "the mistaken theory that the plaintiff cannot choose a federal forum for assertion of federal rights if a state remedy is available." 431 F.2d at 1303, n. 9.

6. In *Hobbs*, it is said that the *Schwartz* position on exhaustion "has been explicitly repudiated by this court." 448 F.2d at 461, n. 11.

suming", thus establishing a fourth comprehensive statutory purpose and rendering the existence and adequacy of state remedies utterly immaterial. On the other hand, reading in context, the quoted language can be taken as a reiteration of the third statutory purpose, to wit: the providing of a federal remedy where the state remedy, though theoretically available, was in practice illusory. In *Schwartz*, this Court took the view and still holds the view that the second reading of the "supplementary" language is the correct one for the following reasons:

(a) This Court's thorough examination of the setting and legislative history of Section 1983

> . . . . make it clear that the Act was not adopted to supersede state laws affording remedies for derelictions by state officials. Rather, it was enacted to provide a remedy only where one either did not exist or for some reason an existing remedy was unenforced or otherwise insufficient.

*Schwartz*, 309 F.Supp. at 1041. The Congressional purpose was not to replace state courts with federal ones, but was to provide a federal remedy for official misconduct in situations where the state procedures had proved inadequate. In so concluding, this Court is mindful that Section 1983 had its genesis during Reconstruction, a period of political turmoil which bears little resemblance to the relative domestic stability of today. It has been authoritatively acknowledged that the jurisprudence "was characterized during the war years by 'a noticeable lack of legal precision' and by '[a] tendency toward irregularity . . . in legislation and in legal interpretation.' J. Randall, Constitutional Problems under Lincoln, 515–516 (rev. ed. 1951). Nor would the postwar period of Reconstruction be substantially different." Oregon v. Mitchell, 400 U.S. 112, 252, 91 S.Ct. 260, 329, 27 L.Ed.2d 272 (1970)

(opinion of Brennan, White and Marshall, JJ.). Therefore, in construing the broad language of the statute, a court must be cognizant that the Ku Klux Klan Act of 1871 emerged from the discord and confusion in the wake of fratricidal warfare and was designed to cope with a virtual breakdown of civil order in large portions of the Nation. Similarly, the Fourteenth Amendment was writ in the blood of armies and its grand design was to extirpate the vestiges of human bondage from this Republic. Cf. Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1872). Stated bluntly, the Amendment and its implementing legislation such as Section 1983 were concerned with very serious matters of national import, none of which have the slightest thing to do with the plaints of a mischievous schoolboy.

(b) Textual exegesis of *Monroe* compels the conclusion that the Court used the word "supplementary" in its natural and accepted meaning of supplying a want, making an addition, or filling a deficiency. Cf. Webster's Third New International Dictionary (1961). Supportive of this interpretation is the Court's use of the phrases "and refused" and "if enforced", which suggest a continuity of theme with its preceding discussion of state remedies which, though on the books, were unavailable as a practical matter.[7]

(c) To read the Court's "supplementary" language as creating a fourth and virtually unlimited occasion for the application of Section 1983 would render superfluous and redundant its previous discussion of the second and third statutory purposes. If it is to be held that Section 1983 provides an all-encompassing federal constitutional remedy to be applied without regard to state remedies, then the substantial portion of the opinion devoted to discussing the limited curative purpose of the statute must be

---

7. "The language upon which the plaintiffs rely as it thus appears in context . . . simply emphasizes that the federal court must be certain that a remedy that seems 'adequate in theory' will be 'available in practice'; it is not enough that the state statute will be adequate 'if enforced'." Potwora ·v. Dillon, 386 F.2d 74, 77 (2nd Cir. 1967).

viewed as a mere scholarly exercise. Such a construction is, of course, unwarranted.

(d) Finally, and most importantly, the Supreme Court has quite recently illuminated the meaning of *Monroe*. In Askew v. Hargrave, 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971) (per curiam), the Court vacated and remanded a judgment of a three-judge district court which had struck down on equal protection grounds a state law relating to the financing of public education. The district court, reading *Monroe* to mean that the existence of state remedies is irrelevant, had declined to stay its hand to afford the state courts an opportunity to construe the challenged statute. After stating flatly that the lower court's reliance upon *Monroe* was misplaced, the Supreme Court observed that, "*Monroe v. Pape is not in point, for there 'the state remedy, though adequate in theory, was not available in practice.'* 365 U.S. at 174, 81 S.Ct. at 477." 401 U.S. at 478, 91 S.Ct. at 858 (emphasis added). In view of this unambiguous statement in *Askew,* disputation about a possible supplementary fourth purpose should now be put to rest, for we have it on the highest authority that the Supreme Court itself views *Monroe* as falling within the third statutory purpose of Section 1983, which is to provide a federal forum only when a state remedy is adequate on its face but in practice unavailable.

*Askew* is particularly significant in the Fifth Circuit because it casts serious doubt on the continued vitality of the view of Section 1983 which was taken in Hall v. Garson and Moreno v. Henckel, supra, both of which were decided prior to *Askew.* This view, as stated in *Moreno,* is that the statute provides a comprehensive federal remedy and is to be applied regardless of state remedies, i. e., "(t)his supplementary function of the act is a fourth main aim or perhaps an overriding purpose inherent in the general terms of the act." 431 F.2d at 1304.

In Hobbs v. Thompson, supra, the Court of Appeals clearly stated that its view of the exhaustion requirement expressed in *Hall* and *Moreno* was "based upon a reading of Monroe v. Pape." 448 F.2d at 461. However, the Court of Appeals' broad reading of *Monroe* is pinioned upon the then-extant view, expressed prior to the Supreme Court's interpretation of *Monroe* in *Askew,* that the state remedies available to the plaintiffs in *Monroe* were adequate and available, and must therefore have been held to be irrelevant. This reasoning is frankly stated in *Moreno,* 431 F.2d at 1304.

> *The significant fact is that Monroe v. Pape does not come within any of the 'three main aims'.* In that case Chicago police officers, without a warrant, broke into the plaintiff's home and subjected him to various abuses.

> The Supreme Court, through Mr. Justice Douglas, did not say or imply that the state procedures or courts in Illinois were inadequate to afford redress (emphasis in original).

It is respectfully suggested that this interpretation of *Monroe* must now be regarded as erroneous. With the hindsight assistance of *Askew, decided subsequently* to both *Hall* and *Moreno,* we now know that the state remedy under examination in *Monroe* "though adequate in theory, was not available in practice." 401 U.S. at 478, 91 S.Ct. at 858. Therefore, *Monroe* was clearly not outside the three main aims of the statute, but instead was well within the third aim of providing a federal remedy when the state remedy exists but is ineffective. In view of *Askew's* clarification of *Monroe* in this regard, the precedential value of *Hall* and *Moreno* must be discounted accordingly in situations such as the instant case, where state administrative and judicial remedies are both adequate and demonstrably available.[8]

---

**8.** *Askew* was on the books at the time that *Hobbs* was decided, but the opinion in the latter case does not discuss the material variance between the reading of *Monroe* in *Askew* and that in *Hall* and *Moreno.* In any event, the relief requested in *Hobbs* "pose(d) no threat to an on-going proceeding, either criminal or noncrim-

### 3. Viability of Schwartz category of exhaustion

For the foregoing reasons, this Court is persuaded that its construction of *Monroe* in *Schwartz* was correct at the time and remains tenable despite the dicta to the contrary in at least three subsequent opinions of the Court of Appeals for the Fifth Circuit. This conviction is strengthened by noting that none of the latter cases arose upon facts even remotely analogous to those in *Schwartz,* and the references to *Schwartz* contained therein must be evaluated accordingly.

*Hall* involved an attack upon the constitutionality of a state statute which empowers a landlord to seize the household goods of a delinquent tenant without prior recourse to judicial procedure; *Moreno* was a suit by a disgruntled former municipal employee challenging the constitutionality of his dismissal; in *Hobbs,* a group of fireman attacked a municipal ordinance relating to political activities of city employees. In none of these cases was it demonstrated or was it readily apparent that the plaintiffs could have obtained a prompt and sympathetic hearing of their constitutional claims in state court. Additionally, in none of these cases would the exercise of federal jurisdiction have entailed intrusion into an area of paramount state interest or disruption of an elaborate scheme of state administration.

By contrast, *Schwartz* was a secondary school discipline case and must be read as a secondary school discipline case. It stands only for the proposition that a student with a disciplinary grievance may not, by simply couching that grievance in constitutional terms, employ Section 1983 to transform a federal district court into a sort of educational ombudsman whose function is to review the everyday actions of local school officials. Of pivotal importance to the holding was the fact that the aggrieved student attended school in the State of Texas, whose courts have jealously guarded the rights of students, are demonstrably attentive to "hear student claims with as compassionate a concern as a federal court would, and suffer from no shortcoming not shared by federal courts which might prevent them from reaching a just result." 309 F.Supp. at 1043–1044.[9]

For *Schwartz* to be correctly applied, the existence, availability, and practical utility of state remedies must not be a matter of facile assumption or speculation. Such remedies must affirmatively and unequivocally appear or be shown to exist by reference to state statutory and decisional law.[10] Such an inquiry was undertaken in *Schwartz,* and it was there found as a fact that the state

inal." 448 F.2d at 469. In the instant case there is an ongoing state civil proceeding. The pendency of this state suit brings into play the considerations of restraint expressed in Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Although the problem of *Younger's* applicability to a threatened future criminal prosecution was expressly left open, cf. Wulp v. Corcoran, 454 F.2d 826 (1st Cir., 1972), the Court's discussion of the principles underlying the Anti-Injunction Act of 1793, now 28 U.S.C. § 2283, strongly suggest that defendants' use of removal in the instant civil case is inconsistent with the Congressional "desire to permit state courts to try state cases free from interference by federal courts." 401 U.S. at 43, 91 S.Ct. at 750.

9. The large body of Texas jurisprudence relating to student rights is illustrated by the cases collected at 309 F.Supp. at 1044, n. 9. To this list should now be added Texarkana Ind. School District v. Lewis, 470 S.W.2d 727 (Tex.Civ.App.—Texarkana 1971), a recent and striking example of state court constitutional adjudication involving high school discipline.

10. It should be emphasized that *Schwartz* did *not* place upon the party seeking a federal forum the burden of proving that state remedies are inadequate, nor would there have been authority for doing so. Rather, the burden should be upon the party seeking dismissal to demonstrate that state remedies are truly adequate and available. The failure of the defendants to meet this burden in *Monroe* was clearly implied by the paragraph of that opinion in which the troublesome "supplementary" language appears. 365 U.S. at 183, 81 S.Ct. 473.

remedies open to plaintiff were both adequate and available. In the case at bar this proposition is not challenged by either the defendant nor the plaintiff, the latter having attempted to avail himself of those remedies only to be frustrated by removal. Accordingly, the Court hereby finds as a fact that an adequate remedy is available to plaintiff in the courts of Texas.

The failure of the defendants to demonstrate the adequacy and availability of state remedies is a unifying theme of such cases as Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968), dealing with the application of prison rules, Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967), involving welfare eligibility, and McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963), concerning racial segregation in public schools. In *Houghton* and *McNeese*, the Court either expressly or by clear implication found the state remedy to be inadequate. Damico involved welfare, an essentially federal subject matter. See *Schwartz*, 309 F.Supp. at 1039–1041. On the inadequacy of state remedies in the foregoing cases, see Eisen v. Eastman, 421 F.2d 560 (2nd Cir. 196), certiorari denied 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed. 2d 75 (1970); Metcalf v. Swank, 444 F.2d 1353 (7th Cir. 1971). Conversely, the manifest adequacy and availability of state remedies in Texas school discipline cases is the factor which harmonizes *Schwartz* with such cases as *McNeese* and with the holdings of *Hall, Moreno* and *Hobbs*. In the latter cases, relief from

the constitutional deprivations alleged was no doubt theoretically available in the state courts, as it surely almost always is. However, there was no properly based finding to the effect that state remedies were adequate and available as a practical matter, and those cases are therefore factually distinguishable from *Schwartz* and the case at bar. Theoretical availability is not sufficient reason for requiring exhaustion, and the Court of Appeals so held on the facts of *Hall, Moreno* and *Hobbs*. Completely consistent with that holding is *Schwartz*, in which this Court observed that:

> If the *Monroe* decision clarifies anything in this area, it is that the mere recitation . . . . of the state remedies on the books is insufficient to justify requiring plaintiff to exhaust them. They must appear truly adequate and available subject only to 'the incidental evils which attend upon republican government.'

309 F.Supp. at 1043. In the instant case, the adequacy and availability of state remedies can hardly be gainsaid, for plaintiff has himself chosen a state court in which to assert his rights under both the Federal and State Constitutions, and in that state court he was promptly granted temporary relief. The undeniable proposition that federal courts sit to protect federal rights is an appealing truism, but of little aid to the present inquiry. The sort of federal rights with which Section 1983 is primarily concerned are federal constitutional rights, and whether or not proceeding under the rubric of Section 1983,[11] the Courts of

---

11. Defendant contends that Section 1983 "has no place in and is unknown to Texas law." Whether a state court must entertain a Section 1983 action, denominated as such, is evidently a question of some novelty. See Note, Limiting the Section 1983 Action in the Wake of Monroe v. Pape, 82 Harv.L.Rev. 1486, 1497 n. 62 (1969). Since 28 U.S.C. § 1343(3) is not cast in terms of exclusivity, it would appear that the jurisdiction created may be exercised concurrently by a state court having competent jurisdiction in other respects. Claflin v. Houseman, 93 U.S. 130, 23 L.Ed. 833 (1876). This being

so, it would also appear that a State would not be free to refuse enforcement of a federally created right within its concurrent jurisdiction. Mondou v. New York, N.H. & H.R. Co., 223 U.S. 1, 32 S.Ct. 169, 56 L.Ed. 327 (1912); Testa v. Katt, 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947). However, this interesting question is somewhat beside the point. Unlike federal courts, state courts are courts of general jurisdiction and do not require a statutory jurisdictional grant such as Section 1343(3) in order to enforce federal constitutional rights which, as noted in the text above, they are bound

every State are bound by the Supremacy Clause to enforce such rights. U.S.Const. art. VI. Cf. Martin v. Hunter's Lessee, 14 U.S. (1 Wheat) 304, 4 L.Ed. 97 (1816).

Of equally critical significance to the *Schwartz* rationale is the compelling interest of the state in matters affecting public education, which is "perhaps the most important function of state and local governments." Brown v. Board of Education of Topeka, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). As this Court has noted:

> . . . . (T)he education of Texas children is not an incidental activity of the State of Texas. It is an activity to which the State has devoted the income from millions of acres of public lands, as well as large sums from its general revenues. More than financial, the State's concern has extended to an eager acceptance of its obligation and responsibility to exercise administrative supervision over the local officials directly responsible for educating children in each of its more than 1,200 school districts. It has established a central agency as 'the policy-forming and planning body for the public school system of the state.' Tex.Educ.Code Ann. § 11.24(a). It has made provision for the enactment, dissemination, and enforcement of state-wide rules and regulations. Id. §§ 11.13, 11.24, 11.25(a), (b) . . . It has provided judicial supervision over its educational system which has been effective in keeping administrative action within the law. These administrative and judicial safeguards should be highly respected. A federal court should not intervene in an activity as important to the State as this, except in very exceptional circumstances. See Burford v. Sun Oil Co., 319 U.S. [315] at 332–334, 63 S.Ct. 1098, [87 L.Ed. 1424] (Douglas, J., concurring).

309 F.Supp. 1045–1046.

to enforce. On brief, defendants concede as much: "It is not to be doubted that

To require that an aggrieved secondary school pupil make first recourse to the state remedial apparatus is entirely consistent with our federal form of government. As the division of governmental functions has evolved, the responsibility for public education—involving as it does the promulgation of rules, regulations, and orders for enforcing discipline—has historically been assigned to the States and their political subdivisions. Recognizing this proper allocation of functions and the posture of restraint which it implies on the part of federal courts, the Supreme Court has observed that "(b)y and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968). Cf. Freeman v. Flake, 448 F.2d 258 (10th Cir. 1971). To the extent that such routine conflicts become the subject of frequent constitutional adjudication in the lower federal courts, it is inevitable that a monolithic and stultifying national uniformity will be judicially imposed in the name of the Fourteenth Amendment. Since the general terms of that Amendment contain no concrete standards of decision for the great majority of such suits, it is predictable that the "federal common law" of school discipline which would develop will reflect nothing more than an amalgam of the educational views of divers federal judges, most of whom are suited to the task by neither disposition nor competence. Such a result would be utterly destructive of one of the basic virtues of our federal form of government, which

> . . . is to leave ample room for governmental and social experimentation in a society as diverse as ours, and which also reflects the view of the Framers that 'the security of liberty

the Texas state courts possess the capability of trying this case."

in America rested primarily upon the disperson of governmental power across a federal system.' . . . . The Fourteenth Amendment tempered this basic philosophy but did not unstitch the basic federalist pattern woven into our constitutional fabric. The structure of our Government still embodies a philosophy that presupposes the diversity that engendered the federalist system.

Williams v. Florida, 399 U.S. 78, 133, 90 S.Ct. 1893, 1923, 26 L.Ed.2d 446 (concurring opinion of Harlan, J.)

### B. *The doctrine of judicial abstention*

■ Insofar as an exhaustion requirement serves to channel certain controversies toward the forum most institutionally competent to resolve them, it is similar in operation to the doctrine of judicial abstention—a discretionary procedural device which federal courts of equity have fashioned to achieve a more principled allocation of business between the state and federal judiciaries and to minimize unnecessary conflict between those systems. This legitimate concern stems from a recognition that the drastic and sometimes clumsy tool of federal constitutional injunction should not be casually wielded in areas where state law might provide a remedy equally curative and considerably less intrusive, and therefore less abrasive. Under such circumstances, prior state disposition may substantially alter the constitutional question, or even obviate it altogether.

#### 1. Rejuvenation of *Pullman*

In the seminal case of Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), plaintiff sought to enjoin an order of a state regulatory agency as violative of the Fourteenth Amendment as well as state law. Whether or not the challenged administrative action was supportable under state law was unclear, and Mr. Justice Frankfurter conceded for a unanimous Court that

. . . . . the last word on the statutory authority of the Railroad Commission in this case, belongs neither to us nor to the district court but to the supreme court of Texas. In this situation a federal court of equity is asked to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication. . . . The reign of law is hardly promoted if an unnecessary ruling of a federal court is thus supplanted by a controlling decision of a state court. The resources of equity are equal to an adjustment that will avoid the waste of a tentative decision as well as the friction of a premature constitutional adjudication.

312 U.S. at 500, 61 S.Ct. at 645.

More recently, in Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970), certain fishing laws of Alaska were assailed as violative of both the federal and state constitutions. The Supreme Court held that the federal district court should have stayed its hand pending a state adjudication of the state constitutional questions. Such a disposition was favored because it offered the possibility that the federal question would be eliminated, and it avoided needless and premature friction between federal pronouncements and state policies.

The considerations underlying *Pullman* and *Reetz* are very much at hand in a secondary school discipline case. Not only is school administration an area fraught with local concern, but it is a subject matter utterly permeated by state law—thus affording ample opportunity for incipient federal constitutional questions to be derailed by prior state statutory or state constitutional adjudication. This reality has recently received strong and prestigious recognition by the Court of Appeals for the Second Circuit. In Reid v. Board of Education, 453 F.2d 238 (2nd Cir., 1971), plaintiffs challenged the federal constitutionality of a program for handicapped children provided by the Board of Education of the City of New York. In approving the district court's decision to abstain, the

Court of Appeals observed that the facts pleaded in support of the federal claim would have also supported substantial statutory and constitutional claims under New York law. This factor, coupled with the predominate state interest in education, which was characterized, as "a particularly sensitive and complex area of state regulation", led the Court to conclude that abstention was appropriate pending a prior state adjudication.

The fact that secondary school litigation is often framed in the context of personal constitutional rights such as freedom of speech does not render the abstention doctrine any less applicable in an appropriate case. Although the notion that abstention is forbidden in civil rights litigation did enjoy some currency for a time, it has been authoritatively put to rest by Askew v. Hargrave, supra, *an equal protection case in which abstention was mandated.* As Circuit Judge Kaufman perceptively discerned in the *Reid* case, the *Askew* Court's application of *Pullman* and *Reetz* in a civil rights context is of truly profound significance. It is the harbinger of a growing reluctance on the part of federal courts to set themselves up as sole arbiters of personal rights, and it bespeaks an increasing concern that lawsuits which seriously implicate state interests be first litigated within the state system of courts.

2. *Applicability in school discipline cases*

The characteristics of secondary school discipline litigation which may sometimes counsel abstention were discussed at length by this Court in Press v. Pasadena Ind. School District, 326 F.Supp. 550 (S.D.Tex.1971). Similarly, the abstention doctrine formed a separate and alternative ground for this Court's holding in Schwartz. Although exhaustion of state remedies and judicial abstention are distinct doctrines, they are not unrelated, as both are responsive to the complex of values which inhere in the concept of comity, to wit: "a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." Younger v. Harris, 401 U.S. 37, 44, 91 S.Ct. 746, 750, 27 L.Ed.2d 669 (1971). Although *Younger* and its companion cases dealt with federal deference to the processes of state criminal justice, much of what was said there on the subject of "Our Federalism" equally supports the proposition that lawsuits spawned within a State's educational system should be litigated within that State's courts, with ultimate review of federal constitutional issues, if need be, in the Supreme Court of the United States.[12]

Although considerations of comity were relevant, the result in *Younger* was also premised upon the traditional reluctance of federal equity courts to interfere with pending state criminal proceedings. Fenner v. Boykin, 271 U.S. 240, 46 S.Ct. 492, 70 L.Ed. 927 (1926); Beal v. Missouri Pac. R. Co., 312 U.S. 45, 61 S.Ct. 418, 85 L.Ed. 577 (1941). This reluctance is founded upon a recognition that the institutional integrity of the state criminal process is not well served by premature federal judicial interference. Except in cases of a great and immediate threat of irreparable loss, it is felt that constitutional questions presented during a state criminal prosecution should best be resolved within the confines of the state court system, with ultimate review of federal questions in the United States Supreme Court.

To some extent, the factors which dictate federal restraint toward the state

---

12. "Thus from the beginning we have had in this country two essentially separate legal systems. Each system proceeds independently of the other with ultimate review in this Court of the federal questions raised in either system." Atlantic Coast Line Railroad Co. v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 286, 90 S.Ct. 1739, 1743, 26 L.Ed.2d 234 (1970). Cf. Bond v. Dentzer, 325 F. Supp. 1343, 1346 (N.D.N.Y.1971).

criminal process are also applicable in the context of the state school disciplinary process. Although obviously different in severity, both processes represent the application of the State's coercive power to preserve order. The State through its criminal law applies sanctions to ensure that degree of domestic tranquility necessary to an enduring civil society. Likewise, a secondary public school, being to some extent a microcosm of society, as authorized by law, establishes rules and applies sanctions with a view toward preserving that degree of discipline (which Webster equates with "orderly conduct") necessary to the learning experience. Cf. Hailey v. Brooks, 191 S.W. 781 (Tex.Civ.App.—Ft. Worth 1916, no writ). This obvious parallel between the criminal process and the school disciplinary process has found recognition in the constitutional requirement that rudimentary due process be observed when serious disciplinary sanctions are imposed by schools. Cf. Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir. 1961), cert. denied 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961). Another consequence of this parallel is that the principles underlying *Younger* apply with equal force. Just as a State in a criminal case is given an opportunity to correct its own constitutional mistakes within its appellate court system, so should the State be accorded first administrative and judicial review of alleged constitutional deprivations arising from the public school disciplinary process. This order of priority is firmly rooted in considerations of policy.

First, in working its way through the state system, the issue might be substantially altered or even resolved on a non-constitutional ground. The prior state adjudication might either clarify the constitutional issue or eliminate it, thus avoiding a tentative, premature, and possible unnecessary federal constitutional adjudication. Railroad Commission of Texas v. Pullman, *supra*; Carr v. Brazoria County, 341 F.Supp. 155 (S.D.Tex. 1972).

Second, an insistence that constitutional claims arising from school operation be pressed initially through the state administrative and judicial apparatus encourages institutional responsibility, i. e., it nurtures a sensitivity to constitutional considerations which might otherwise be lacking. If all disciplinary problems involving a constitutional aspect are immediately diverted into federal court it is only reasonable that school boards may tend to ignore such matters as outside their province. This indifference, in turn, will spawn more federal litigation, until we shall have produced in the end a vicious circle in which the federal courts run the schools—a state of affairs which is obviously unhealthy for federal courts and schools alike.

Finally, prior reference of school disciplinary problems to the state administrative and judicial systems is consistent with the fact that the fundamental political unit charged with the administration of public instruction in this country is the State. Cf. Bulluck v. Washington, 40 U.S.L.W. 2463 (C.A.D.C. Jan. 19, 1972). The States, in turn, have delegated this responsibility in varying portions to their political subdivisions, such as school districts. Many of these districts themselves embrace numerous schools of widely varying characteristics. The simple consequence of this diversity is that uniform standards of operation—including disciplinary rules and practices—are impossible. Any attempt to employ the federal judicial power to impose uniformity upon this vast, diverse and peculiarly local subject matter will end unhappily. If such an effort were successful, a fundamental reordering of our polity would have been effected in the complete absence of political approval. If such an effort were ultimately unsuccessful, much federal-state friction and litigious discord shall have gone for naught, and the efficiency of the schools as well as the prestige of the federal courts shall have suffered unnecessarily. As this Court wrote in Press v. Pasadena Ind. School District, supra:

> Ours is a large and heterogeneous union of fifty States, each of which administers a system of public education in a more or less democratically re-

sponsive manner. Climatic conditions, ethnic compositions, cultural mores, and attitudes about proper deportment of school children vary by region and locale. Within an area demarked by well-defined federally protected rights —such as the right to be free from racial discrimination—there is a broad zone of flexibility in which this healthy diversity may reflect itself through the governance of the secondary schools.

326 F.Supp. at 566.

### 3. *Considerations of economy*

Not only is the consideration of secondary school discipline suits inherently disruptive of the delicate balance of federalism, this rapidly growing field of litigation seriously impairs economic judicial administration within the federal court system. As Mr. Justice Black cogently observed in connection with a school discipline case:

> The records of the federal courts, including ours, show a heavy burden of litigation in connection with cases of great importance—the kind of litigation our courts must be able to handle if they are to perform their responsibility to our society. Moreover, our Constitution has sought to distribute the powers of government in this Nation between the United States and the States. Surely the federal judiciary can perform no greater service to the Nation than to leave the States unhampered in the performance of their purely local affairs.

Karr v. Schmidt, 401 U.S. 1201, 1203, 91 S.Ct. 592, 593, 27 L.Ed. 597 (1971). Cf. Alberda v. Noell, 322 F.Supp. 1379 (E.D. Mich.1971). A recent extra-judicial expression of the Chief Justice is in accord:

> As to the future I can do no more than emphasize that the federal court system is for a limited purpose and lawyers, the Congress and the public must examine each demand they make on that system. . . . We should look more to state courts familiar with local conditions and local problems.

See: Address by Mr. Chief Justice Warren E. Burger on the State of the Federal Judiciary (American Bar Association, August 10, 1970). See also: Wisconsin v. Constantineau, 400 U.S. 433, 439, 91 S.Ct. 507, 27 L.Ed.2d 515 (dissenting opinion of Mr. Chief Justice Burger).

■ In deference to these considerations, it should be only for the most compelling reasons that federal courts accept the invitation to extend their writ into the dense tangle of discord inevitably arising from the ordinary administration of local schools. The typical secondary school discipline dispute presents no such compelling reasons. In short, such cases raise questions, for the resolution of which the federal courts have neither the judicial resources nor the institutional competence.

### 4. *The First Amendment issue*

With respect to institutional competence, the courts of Texas are manifestly suited to perform the sort of First Amendment analysis required by Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), to wit: an assessment of the challenged regulation on the basis of its reasonable relationship to the goal of preventing disruption of the work and discipline of the school concerned. This is a highly individualized process and the legal result may vary from one school setting to another. See, e. g., Burnside v. Byars, 363 F.2d 744 (5th Cir. 1966), Blackwell v. Issaquena County Board of Education, 363 F.2d 749 (5th Cir. 1966). Cf. P. G. Haskell, Student Expression in the Public Schools: Tinker Distinguished, 59 Georgetown L.J. 37 (1970).

■ Even in the realm of prior restraints, it is well settled that the constitutional prohibition "is not absolutely unlimited," Near v. Minnesota, 283 U.S. 697, 716, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), nor are such restraints "necessarily unconstitutional under all circumstances." Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 n. 10, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963). The validity of such a restraint depends upon its operation

and effect in context. Kingsley Books, Inc. v. Brown, 354 U.S. 436, 441, 77 S.Ct. 1325, 1 L.Ed. 1469 (1957). Compare Times Film Corp. v. Chicago, 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961), with Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). Of critical significance to such an evaluation is the nature of the institutional setting in which the prior restraint operates. For example, the Court of Appeals for this Circuit has recently had occasion to consider and approve a prior restraint upon the dissemination of literature in the context of a domestic Army post. The Court reasoned as follows:

> Stationed at Fort Sam Houston are units continually and continuously undergoing training and participating in programs for the national defense. The installation commander has a duty to maintain order and discipline among his personnel. In pursuance of this duty he would be expected to monitor the literature available to military personnel on the base. He must be aware of the contents of materials which are to be distributed outside of regularly established and approved channels and to determine if such materials interfere with the purpose of the reservation. [The regulation] is, we think, a highly reasonable method of maintaining discipline and morale on the base. It is a justifiable means of accomplishing these purposes.

United States v. Flower, 452 F.2d 80, at p. 85 (5 Cir. 1971). The factual parallel of the military base in *Flower* to the high school in the instant case is obvious. The school children are compelled by state law to attend school and are therefore a captive audience during the school hours of the day. Insofar as the preservation of discipline and order are necessary to the primary institutional goal of education, school administrators have the duty to assure that exercises of expression inconsistent with that goal are not inflicted upon the captive audience. Furthermore, in discharging that responsibility, school officials are entitled to consider the special characteristics of their charges,

such as emotional immaturity. See Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968).

All of these factors must be weighed in assessing the validity of a prior restraint in the high school setting. Taking such an approach in Eisner v. Stamford Board of Education, 440 F.2d 803 (2nd Cir. 1971), the Court of Appeals for the Second Circuit considered a prior restraint rule in the context of a secondary public school and found the rule to be valid in principle although procedurally insufficient. The Court stated:

> A public school is undoubtedly a 'marketplace of ideas'. Early involvement in social comment and debate is a good method for future generations of adults to learn intelligent involvement. But we cannot deny that Connecticut has authority to minimize or eliminate influences that would dilute or disrupt the effectiveness of the educational process as the state conceives it. The task of judging the actual effects of school policy statements and regulations is a delicate and difficult one. But, to the extent that the Board's policy statement here merely vests school officials under state law with authority which under *Tinker* they may constitutionally exercise, it is on its face unexceptionable.

440 F.2d at 807. By reason of their familiarity with local conditions and their close proximity to the all-important factual setting, state trial courts are uniquely qualified to perform this "delicate and difficult" task.

### C. *Recapitulation*

Therefore, to recapitulate, it is seen that two determinative factors led this Court to require exhaustion of state remedies in *Schwartz:*

(1) the manifest availability and effectiveness of remedies, both in theory and practice, which Texas affords its students, and

(2) the reluctance with which federal courts should inject themselves into an area of activity in which the State's in-

terest is predominant and in which a structured and comprehensive scheme of state administration is operative.

Only in a case where both of these factors are found together would exhaustion properly be required. In practice, it may well be that school discipline cases, school "hair" cases, school "underground newspaper" cases, and the ilk are the only suits which will fall into this category. *Schwartz* was such a case, as is the case at bar. To the extent, if any, that language in *Schwartz* may have been construed to imply that its sweep was broader than the facts upon which it was decided, that possible implication has been corrected by a higher court in *Hall, Moreno* and *Hobbs*.

Finally, it is reiterated that neither of the crucial factors discussed above were present in *Hall, Moreno* or *Hobbs*. Until a court of higher authority rejects the *Schwartz* rationale upon a factual situation sufficiently comparable to raise that rejection above the stature of "general expression",[13] this Court will continue to view *Schwartz* as applicable law in secondary school discipline cases.

It follows that this Court may not entertain the instant Section 1983 suit brought by a high school student whose unexhausted state remedies are both adequate and available. Accordingly, plaintiff's motion to remand is granted. This suit is remanded to the state court in which it was commenced. 28 U.S.C. § 1447(c).

Parenthetically, it is appropriate to remark upon what is surely one of the most peculiar removal petitions which has ever been filed with the Clerk of this Court. School districts in Texas are quasi-municipal corporations, i. e., "state agencies, erected and employed for the purpose of administering the state's system of public schools." Love v. City of Dallas, 120 Tex. 351, 40 S.W.2d 20, 26 (1931). The times must indeed be out of joint when an agency of the state flies headlong into a federal court in order to avoid subjecting itself to a federal constitutional adjudication in a court of its own State. Although this Court is reluctant to attribute to defendants the base motive of judge-shopping, this would appear to be the only rational explanation for such an anomolous procedural maneuver.

This Memorandum and Order constitutes the Court's findings of fact and conclusions of law.

13. ". . . (G)eneral expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision." Cohens v. Virginia, 19 U.S. (6 Wheat) 264, 399, 5 L.Ed. 257 (1821). The decision of a higher court is binding to the extent of its ratio decidendi, a rule which in this Circuit requires that higher priority be accorded the facts of a decided case than the reasons assigned for decision. Harkless v. Sweeny Ind. School District, 427 F.2d 319, 321 (5th Cir. 1970), certiorari denied 400 U.S. 991, 91 S.Ct. 451, 27 L.Ed. 2d 439 (1971), which appears to be a modification of the less restrictive view taken in Walker v. State of Georgia, 417 F.2d 5, 8 (5th Cir. 1969).